HEANEY, Senior Circuit Judge:
LTV Steel Company, Inc. (“LTV Steel”), and three wholly owned subsidiaries, BCNR Mining Corporation, Nemacolin Mines Corporation and Tuscaloosa Energy Corporation . (collectively, with LTV Steel, “LTV”), appeal from a judgment of the district court encompassing two separate decisions. The first decision held that LTVs obligations under the Coal Industry Retiree Health Benefit Act of 1992 (“Coal Act”), Pub.L. No. 102-486,106 Stat. 2776, 3036-3056, were not pre-petition claims that must be disallowed under Chapter 11 of the Bankruptcy Code. In re Chateaugay Corp., 154 B.R. 416 (S.D.N.Y.1993). *481 The second decision rejected LTV’s Due Process and Takings Clause attacks on the constitutionality of the Coal Act. In re Chateaugay Corp., 163 B.R. 955 (S.D.N.Y.1993). We affirm.
I. FACTUAL BACKGROUND
The roots of this controversy stretch back to 1946, when the United Mine Workers of America (“UMWA”) launched a strike over the issue of health and pension benefits. When labor/management negotiations collapsed, President Truman invoked his powers under the War Labor Disputes Act and.ordered Secretary of the Interior Julius A. Krug to take possession of the nation’s mines for one year. See Exec. Order No, 9728, 11 Fed.Reg. 5593 (1946); see also Exec. Order No. 9758, 11 Fed.Reg. 7927 (1946). Seeking a rapid resumption of production at the idled mines, Krug negotiated with UMWA Presi- ■ dent John L. Lewis to establish terms and conditions for the period of government control. The resulting Krug-Lewis Agreement established an unprecedented system for providing health and pension benefits to workers at the center of which stood two separate, industry-wide benefit funds. The first, the Welfare and Retirement Fund, was financed by a flat five-cent fee levied on each ton of mined coal and was jointly governed by representatives of the UMWA and the federal government. The second, the Medical and Hospital Fund, depended solely on miner-approved wage deductions and was administered by trustees appointed by the UMWA. The following year, the UMWA and the major mining companies agreed to make permanent the existence of the funds, though in different form. Marking the return of the mines to their corporate owners, the National Bituminous Coal Wage Agreement of 1947 merged the two Krug-Lewis funds into a single entity, the United Mine Workers of America Welfare and Retirement Fund. Perhaps unavoidably, various disputes between the UMWA and the coal operators accompanied the new fund’s first several years of operation, generating labor unrest and periodic strikes.
In 1950, a successor National Bituminous Coal Wage Agreement (“NBCWA”) was negotiated by the UMWA and the Bituminous Coal Operators Association (“BCOA”), a newly formed multiemployer association of major coal companies.[1] The 1950 Wage Agreement ushered in a two-decade era of labor/management cooperation in the coal industry. In exchange for union acquiescence in the mechanization of mines, the mining companies that signed the 1950 Wage Agreement (“signatory operators”) agreed to establish the United Mine Workers Welfare and Retirement Fund of 1950 (“1950 W & R Fund”), an irrevocable trust funded on a pay-as-you-go basis. As' provided in the 1950 Wage Agreement, the purpose of the 1950 W & R Fund was to provide “benefits to employees of [signatory] Operators, their families and dependents for médical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness ... [and] benefits on account of sickness, temporary disability, permanent disability, death or retirement.” 1950 Wage Agreement, at 136.[2] The UMWA and the BCOA each named one trustee of the 1950 W & R Fund; those two in turn mutually agreed upon a third, neutral trustee. The trustees exercised sole discretion over the' specific nature of the benefits provided by the 1950 W & R Fund. The 1950 Wage Agreement obligated signatory operators to contribute to the 1950 W & R Fund thirty cents per ton of coal mined throughout the life of the agreement.
Until 1971, the successor NBCWAs and related amendments left essentially untouched the operation of the 1950 W & R *482 Fund.[3] The 1971 Wage Agreement removed from the 1950 W & R Fund’s trustees the discretion to set benefit levels, vesting the power instead in the hands of the UMWA and the BCOA. Consequently, the scope and operation of the 1950 W & R Fund again became the central issué of the collective bargaining process. The negotiations over the 1974 Wage Agreement generated the first major overhaul of the miners’ health and pension benefit delivery scheme. In the wake of court-ordered administrative reforms, see Lamb v. Carey, 498 F.2d 789 (D.C.Cir.1974), cert. denied, 419 U.S. 869, 95 S.Ct. 128, 42 L.Ed.2d 108 (1974), and Blankenship v. Boyle, 329 F.Supp. 1089 (D.D.C.1971), aff'd, 511 F.2d 447 (D.C.Cir.), cert. denied, 419 U.S. 869, 95 S.Ct. 128, 42 L.Ed.2d 108 (1974), significant demographic changes in the population of active and retired miners, and Congress’s enactment of the Employee Retirement Income Security Act of 1974 (“ERISA”), 29 U.S.C. § 1001 et seq., the UMWA and BCOA determined that sweeping changes in the 1950 W & R Fund’s administrative mechanisms were necessary. First, the 1974 Wage Agreement divided pension from nonpension benefit funds. The signatory operators’ pension obligations under the 1950 W & R Fund were transferred to a new entity known as the UMWA 1950 Pension Trust. Nonpension benefits such as health care were transferred to two separate entities: the UMWA 1950 Benefit Plan and Trust (“1950 Benefit Trust”) and the UMWA 1974 Benefit Plan and Trust (“1974 Benefit Trust”). The 1950 Benefit Trust covered those who retired prior to January 1, 1976; the 1974 Benefit Trust covered later retirees. Because the 1950 Pension Trust received all of the assets of the 1950 W & R Fund, the 1950 and 1974 Benefit Trusts began with a zero funding base. BCOA members and other signatories to the 1974 Wage Agreement committed to fund the 1950 and 1974 Benefit Trusts on the basis of cumulative hours worked, rather than tons of coal mined.
Second, and perhaps most significantly, the 1974 Wage Agreement included an explicit promise that health benefits would be provided to covered retired miners, their spouses, and certain dependents for life. For example, the 1974 Wage Agreement provision for past retirees stated:
Any pensioned miner covered in this Plan will retain his Health Services card until death, and upon his death his widow will retain a Health Services card until her death or remarriage.
1974 Wage Agreement, at 99; JA 247.[4] Virtually identical language was applied to future retirees and their widows, disabled miners and their widows, and disabled or retarded children. Id. at 99, 101, 103, 105, 106; JA 247, 248, 249, 250, 251. The 1978 Wage Agreement and its successors contained even more explicit language, providing that a miner with at least twenty years of service was “entitled to receive health benefits until death,” and “entitled, to retain his Health Services Card for life,” and that, after the miner’s death, his widow was “entitled to receive health benefits until her death or remarriage.” 1978 Wage Agreement, at 116, 117, 119, 120; JA 278, 279. Again, similar language applied to disabled miners and their dependents and to disabled and retarded children. Id. at 119, 125; JA 279, 282.
Ironically, the 1978 negotiations between the UMWA and BCOA resulted in the partial dismantling of the 1974 benefit scheme. In simplest terms, the parties agreed to shift from a centralized multiemployer benefit trust to a decentralized scheme in which each signatory operator established and financed its own individual health benefit delivery plan. Each post-1975 retiree was assigned to the single-employer plan operated by his or her last employer. Pre-1976 retirees continued to receive their benefits from the mul-tiemployer 1950 Benefit Trust. The 1974 Benefit Trust was also retained, but with the sharply limited mission of providing health benefits to the so-called “orphans”: UMWA retirees whose last employer had gone out of *483 business. The mining companies assumed the burden of providing for the “orphaned” retirees as an industry-wide responsibility.
Unlike the prior NBCWAs, the 1978 Wage Agreement contained a so-called “guarantee” clause:
Guarantee of 1950 Plans and Trusts and 1974 Plans and Trusts
Notwithstanding any other provisions in this Agreement the Employers hereby agree to fully guarantee the pension and health benefits provided by the 1950 Pension Fund, the 1950 Benefit Fund, the 1974 Pension Fund, the 1974 Benefit Fund and all other benefit plans described in Section (e) of this Article XX during the term of this agreement.
In order to fully fund these guaranteed benefits the BCOA may increase, not decrease, the rate of contributions to be made.... These contributions, which may be adjusted from time to time, shall ■ be made by all Employers signatory hereto during the term of this Agreement.
Id. at 113-14; JA 276-77. This clause obligated signatory mine operators to make sufficient contributions to insure payment of the benefits that had been promised for life in the 1974 Wage Agreement, but only until the expiration of that agreement. Signatories to subsequent National Bituminous Coal Wage Agreements were similarly bound.
In addition, the 1978 Wage Agreement added to the 1950 and 1974 Benefit Trusts “evergreen” clauses which provided:
Any Employer who employed any Participant eligible for coverage under, or who received or receives benefits under, the [1950/1974] Benefit Plan and Trust, or any Employer who was or is required to make, or who has made or makes contributions to the [1950/1974] Benefit Plan and Trust, is obligated and required to comply with the terms and conditions of the [1950/1974] Benefit Trust, as amended from time to time, including, but not limited to making the contributions required under the [1978 Wage Agreement], as amended from time to time, and any successor agreements thereto.
The D.C. Circuit has interpreted these clauses to require coal mine operators who signed the 1978.or a subsequent Wage Agreement and who continue to operate in the mining industry “to contribute to the trusts at the rates specified in the current NBCWA, irrespective of the employer’s failure [to] sign that NBCWA.” UMWA 1974, Pension v. Pittston Co., 984 F.2d 469, 473 (D.C.Cir.), cert. denied, — U.S. -, 113 S.Ct. 3040, 125 L.Ed.2d 726 (1993). The effect of the Pittston decision was to prevent still active coal companies from avoiding their contribution responsibilities by signing “nonconforming” agreements with the UMWA instead of joining a successor NBCWA.
Through its corporate' predecessors, LTV played a central role in the negotiation and implementation of the various NBCWAs and was signatory to each NBCWA through 1984. Olga, Nemacolin, BCNR and Tuscaloosa were signatories through 1984, J & L through 1981, and Youngstown and Republic through 1978.
By the late 1980s, the retiree benefit plans had sunk into deep financial crisis. The sources of the crisis were varied and complex. First, during the 1980s the number of employers contributing to the 1950 and 1974 Benefit Trusts declined, while the number of “orphaned” beneficiaries — that is, those whose former employers no longer made contributions — increased. Following a series of court decisions, the 1974 Benefit Trust found itself liable for the health benefits of a substantially greater population of retirees than its architects had anticipated. See District 29, United Mine Workers of America v. Royal Coal Co. (“Royal Coal I”), 768 F.2d 588 (4th Cir.1985); District 29, United Mine Workers of America v. UMWA 1974 Benefit Plan & Trust (“Royal Coal II”), 826 F.2d 280 (4th Cir.1987), cert. denied, 485 U.S. 935, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988); United Mine Workers of America v. Nobel, 720 F.Supp. 1169, 1176 (WD.Pa.1989), aff'd, 902 F.2d 1558 (3d Cir.1990), cert. denied, 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 212 (1991). With these cases, signatory operators secured their right to discontinue their individual employer health plans by declining to sign a successor Wage Agreement, there *484 by shifting the cost of their retirees’ health benefits onto the shoulders of the 1974 Benefit Trust. Specifically, the Royal Coal/Nobel line of cases established that the 1974 Benefit Trust bore the responsibility of providing health benefits not only to retirees whose former employers had gone out of business, but also to those whose former employers remained in business but had ceased mining operations. In Royal Coal I, 768 F.2d at 592, the Fourth Circuit held that a signatory operator’s obligation to contribute to the 1974 Benefit Trust ceased with the expiration of the Wage Agreement then in effect. Conversely, in Royal Coal II, 826 F.2d at 283, the Fourth Circuit held that the 1974 Benefit Trust could not disclaim sole liability for the health benefits of “orphans,” even when their former employers, having left the bituminous coal mining industry, remained financially healthy and capable of making contributions. This latent loophole was embodied in the 1950 and 1974 Benefit Trusts’ funding mechanisms, which calculated contributions according to the number of tons of coal mined or the number of hours worked by an operator’s miners. When a company ceased mining operations, the Benefit Trusts’ financing formula calculated a required contribution of zero. Until the 1988 Wage Agreement, no prefunding requirement or withdrawal liability was imposed on employers who declined to sign a new NBCWA upon the termination of the old.
Second, as throughout American industry, the costs of health care rose steeply. Between 1980 and 1990, the total cost of health care benefits paid by the 1950 and 1974 Benefit Trusts doubled from $117.4 million to $245.3 million. In short, an ever-smaller number of mining companies incurred the increasing costs of providing benefits to ever-greater numbers of retirees.
In 1986, LTV became part of this exodus from the mining industry. Along with over fifty subsidiaries and affiliates, LTV filed for protection under Chapter 11 of the Bankruptcy Code on July 17, 1986. The Federal Reporters abound with the fallout from LTV’s bankruptcy, and we need not recount its history here. See, e.g., In re Chateaugay Corp., 10 F.3d 944 (2d Cir.1993); In re Chateaugay Corp., 988 F.2d 322 (2d Cir.1993); In re Chateaugay Corp., 973 F.2d 141 (2d Cir.1992); In re Chateaugay Corp., 961 F.2d 378 (2d Cir.1992); In re Chateaugay Corp., 945 F.2d 1205 (2d Cir.1991), cert. denied, 502 U.S. 1093, 112 S.Ct. 1167, 117 L.Ed.2d 413 (1992); In re Chateaugay Corp., 944 F.2d 997 (2d Cir.1991); In re Chateaugay Corp., 930 F.2d 245 (2d Cir.1991); In re Chateaugay Corp., 928 F.2d 63 (2d Cir.1991), cert. denied, 502 U.S. 1093, 112 S.Ct. 1167, 117 L.Ed.2d 413 (1991); In re Chateaugay Corp., 924 F.2d 480 (2d Cir.1991). For our purposes, it is sufficient to note that after the expiration of the 1984 Wage Agreement in 1988, LTV successfully sued to establish that the 1974 Benefit Trust, and not LTV, was responsible for providing health benefits to LTV’s retired former employees, their widows and dependents. See In re Chateaugay Corp., 945 F.2d 1205 (2d Cir.1991), cert. denied, 502 U.S. 1093, 112 S.Ct. 1167, 117 L.Ed.2d 413 (1991). Focusing on the phrase “during the term of this agreement” contained in. the guarantee clauses and elsewhere, this court held that a given NBCWA’s contribution requirement did not extend beyond the agreement’s expiration date. Id. at 1209. By departing the coal industry for other endeavors or going out of business entirely, companies like LTV could jettison their retirees into the Benefit Trusts and obtain full legal' absolution of the responsibility to fund health benefits for their own former miners. Because the UMWA and BCOA had agreed that the Benefit Trusts should provide health benefits to retirees whose last employers had gone out of business, LTV also succeeded in unloading its share of the cost of health benefits for the truly “orphaned” retirees.
By the beginning of the 1990s, the Benefit Trusts had reached an untenable state of financial crisis. The looming insolvency of the Benefit Trusts spurred significant labor strife in the coal fields, culminating in an eleven-month strike against the Pittston Coal Company in 1989. After failed attempts at collective bargaining by the UMWA and Pitt-ston, the Secretary of Labor intervened and brokered a settlement. Responding to the prospect of continuing disruptions in the nation’s coal fields, the Secretary created the Advisory Commission on United Mine Work *485 ers of America Retiree Health Benefits (“Coal Commission”) to diagnose the problem and propose a long-term solution.
In November 1990, the Coal Commission submitted its findings and recommendations to the Secretary. See Coal Commission Report: A Report to the Secretary of Labor and the American People (Nov. 1990), JA 393. At the heart of the Coal Commission’s report was the following finding:
Retired coal miners have legitimate expectations of health care benefits for life; that was the promise they received during their working lives and that is how they planned their retirement years. That commitment should be honored. But today those expectations and commitments are in jeopardy.
Coal Comm. Rpt., at 1, JA 405. Reviewing the 1950 and 1974 Benefit Trusts’ funding crisis, the Commission predicted that, absent legislative action, the trusts would run a combined deficit of $300 million in 1993. Id. at 3, JA 407.
The Coal Commission recommended that all companies signatory to at least one NBCWA, whether or not they continue to engage in mining, should bear the cost of providing health benefits to their own retired miners. Also, the Coal Commission recommended that current and former signatory operators collectively share the cost of the “orphaned” retirees. In the Commission’s view, the fairest method of financing health care for retired miners would combine several key features:
[T]he imposition of a statutory obligation to contribute on current and past signatories, mechanisms to prevent future dumping of retiree health care obligations, authority to utilize excess pension assets and the implementation of state-of-the-art managed care and cost containment techniques.
Id. at 60, JA 464.
After two years of study and deliberation, Congress responded to the Coal Commission’s report by enacting the Coal Act, Pub.L. No. 102^186, 106 Stat. 2776, 3036-56 (codified at 26 U.S.C. §§ 9701-9722). The essential thrust of the Coal Act is “to identify persons most responsible for plan liabilities in order to stabilize plan funding and allow for the provision of health care benefits to [coal miner] retirees.” Id., § 19142(a)(2), 106 Stat. at 3037. In other words, the Coal Act requires each current and former signatory operator to pay for its own retirees and to share in the cost of the “orphaned” retirees. As to the benefit delivery vehicle, the policy of the Coal Act is. “to provide for the continuation of a privately financed self-sufficient program for the delivery of health care benefits to the beneficiaries of such plans.” Id., § 19142(b)(1) and (3), 106 Stat. at 3037.
The Act merged the existing 1950 and 1974 Benefit Trusts into a new private trust fund, the UMWA Combined Benefit Fund (“Combined Fund”). 26 U.S.C. § 9702. Only those retirees actually receiving benefits from the Benefit Trusts as of July 20, 1992, were declared eligible to receive benefits from the Combined Fund. Id., § 9703(f). In allocating financial responsibility for costs of the' Combined Fund, Congress determined that “those companies which employed the retirees in question, and thereby benefited from their services, will be assigned responsibility for providing the health care, benefits promised in their various collective bargaining agreements.” 138 Cong.Rec. S17,603 (daily ed. Oct. 8, 1992) (reproducing proposed conference committee report). Accordingly, Congress directed the Secretary of Health and Human Services to levy annual health insurance and death benefit premiums on each “assigned operator.” 26 U.S.C. §§ 9704, 9705. An “assigned operator” was défined as a signatory to any NBCWA since 1950. Id., § 9701(c)(5). The Secretary of Health and Human Services “assigned” each beneficiary to the signatory operator for whom he or she most recently worked when possible, otherwise to the signatory operator that longest employed the beneficiary. Id., § 9706. Where the signatory operator is no longer in business, the liability for its beneficiaries passes to “related persons,” such as successors in interest. Id., §§ 9704(a), 9701(c)(2). The costs of providing health care benefits to the remaining unassigned “orphans” were divided among the assigned operators in proportion to their share of the assigned beneficiaries. Id., § 9704.
*486 In sum, the annual premium for an assigned operator equals the sum of the cost of providing health benefits to the company’s assigned beneficiaries, its pro rata share of death benefit coverage, and its pro rata share of the cost of health benefits for “orphaned” beneficiaries. The Coal Act restricts liability for medical benefit premiums to companies that (1) signed one or more Wage Agreements between 1950 and 1988, (2) continue to “conductf ] or derive[ ] revenue from any business activity, whether or not in the coal 'industry,” and (3) actually employed at least one retiree currently receiving benefits. Id., § 9701(c).
■ To mitigate the financial burden on the coal companies, the Coal Act authorized the transfer to the Combined Fund of certain surplus funds accumulated by the UMWA 1950 Pension Plan and the Abandoned Mine Reclamation Fund. Over the first two years of the Combined Fund’s operation, the Coal Act directed that $210 million be transferred from the 1950 Pension Fund. As a practical matter, the transfers from the 1950 Pension Plan have entirely eliminated the unassigned “orphan” and death benefit assessments for the first two fiscal years of the Combined Fund’s operation. See Declaration of Donald E. Pierce, Jr., at 5, JA 607. Beginning in 1995, transfers from the Abandoned Mine Reclamation Fund will reduce the coal companies’ liability for unassigned beneficiaries by up to $70 million each year through 2004. 26 U.S.C. § 9705(b); 30 U.S.C. § 1232(h). To enforce compliance, the Coal Act authorized the Secretary of the Treasury to impose penalties in the nature of taxes on companies failing to meet their obligations under the Act. See 26 U.S.C. § 9707.
The Coal Act became effective on February 1, 1993. For the first full fiscal year, beginning October 1,1993, LTV was assigned a total of 5,667 beneficiaries, or roughly 7% of the 79,650 Combined .Fund assigned beneficiaries. Pierce Declaration at 4, JA 606. The total premium to be paid by LTV that year was $12,727,118.61. Id. at 2, 4, JA 604, 606. By fully covering both the health benefit premiums for the 25,565 unassigned beneficiaries and the death benefit premiums for all beneficiaries, the first $70 million transfer from the 1950 Pension Fund effectively reduced LTVs per beneficiary premium by 18%. Id. at 2, JA 604. After the transfers, the total premiums to be collected by the Combined Fund from all assigned operators in its first full fiscal year of operation totalled $178,880,359.50. Memorandum from Donald E. Pierce, Jr., to LTV Corp., at 1, JA 610.
LTV filed this action on January 23, 1993. The complaint raises both constitutional and bankruptcy law attacks on the validity of the Coal Act as applied to LTV. First, LTV alleges that the Coal Act violated its Fifth Amendment substantive due process rights and that it constituted a taking of private property for public use without just compensation. Second, LTV claims that its Coal Act premiums are pre-petition claims that must be disallowed under applicable bankruptcy law. In two separate decisions, the district court rejected LTVs claims and dismissed the complaint. See In re Chateaugay Corp., 154 B.R. 416 (S.D.N.Y.1993); In re Chateaugay Corp., 163 B.R. 955 (S.D.N.Y.1993). LTV appeals from the district court’s judgments, and we affirm.
II. CONSTITUTIONALITY OF COAL ACT
LTV alleges two constitutional deficiencies in the Coal Act: first, that the Act violates the Due Process Clause, and second, that the Act constitutes a taking of private property for public use without just compensation.

A. Due Process

Under the due process standards set forth by the Supreme Court, we review laws “adjusting the benefits and burdens of economic life” for arbitrariness and irrationality. Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976). Because it burdens no fundamental rights, the Coal Act is “a classic example of an economic regulation” and is subject only to the minimum scrutiny rational basis test. Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 83, 98 S.Ct. 2620, 2636, 57 L.Ed.2d 595 (1978). Substantive due process requires only that economic legislation be “supported by a legitimate legislative purpose furthered *487 by a rational means.” Pension Benefit Guarantee Corp. v. R.A. Gray & Co., 467 U.S. 717, 729, 104 S.Ct. 2709, 2717-18, 81 L.Ed.2d 601 (1984). Because LTV does not quarrel with the legitimacy of Congress’s purpose in enacting the Coal Act, we need decide only whether the means chosen are “demonstrably arbitrary or irrational.” Duke Power, 438 U.S. at 83-84, 98 S.Ct. at 2636.
The doctrinal landscape which confronts LTVs due process challenge encompasses unusually inhospitable legal terrain. Since its decision in Railroad Retirement Board v. Alton Railroad Co., 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935), the Supreme Court has proven reticent to involve itself in decisions about economic policy. We are aware of no post-1935 cases in which the Supreme Court invalidated an economic regulation on substantive due process grounds. On the contrary, the Court’s posture has been one of deference to Congress’s economic policy prerogatives. See, e.g., Concrete Pipe & Prods. v. Construction Laborers Pension Trust, — U.S. -, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) (upholding retroactive effect of the withdrawal liability provisions of the Multiemployer Pension Plan Amendments Act); General Motors Corp. v. Romein, 503 U.S. 181, 190-92, 112 S.Ct. 1105, 1112, 117 L.Ed.2d 328 (1992) (upholding retroactive legislation affecting Michigan’s compensation benefits law); United States v. Sperry Corp., 493 U.S. 52, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989) (upholding retroactive effect of federal legislation with respect to the costs of an international claims tribunal); PBGC v. R.A. Gray & Co., 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984) (upholding retroactive effect of federal legislation imposing liability for withdrawal from pension plans); Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976) (upholding retroactive effect of federal law imposing liability on coal mine employers for employee disabilities caused by black lung disease); see also Galvan v. Press, 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911 (1954) (upholding retroactive application of federal legislation concerning immigration and deportation of aliens); Chase Sec. Corp. v. Donaldson, 325 U.S. 304, 65 S.Ct. 1137, 89 L.Ed. 1628 (1945) (upholding repeal of statute of limitations which deprived defendant of his sole defense); Paramino Lumber Co. v. Marshall, 309 U.S. 370, 60 S.Ct. 600, 84 L.Ed. 814 (1940) (upholding legislation that reopened a workers’ compensation proceeding after the time for judicial appeal had expired). • In spite of this unbroken chain of unsuccessful due process challenges, LTV argues that Alton controls the disposition of this case. LTV also attempts to distinguish the post-Alton eases to demonstrate that the Coal Act, unlike all other economic legislation reviewed by the Court since 1935, tips the scales of arbitrariness and irrationality. On both counts we find LTV’s arguments unavailing.
In Alton, the Supreme Court struck down a statute requiring railroad carriers to provide pension benefits to recently retired employees. While Alton has never been expressly overruled, courts over many years have expressed doubts about.its continuing validity. See, e.g., Peick v. Pension Benefit Guar. Corp., 724 F.2d 1247, 1266 (7th Cir.1983), cert. denied, 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984) (“The Court’s method of analysis in Turner Elkhorn Mining represents a fundamental shift from that employed in Alton Railroad.”); A-T-O, Inc. v. Pension Benefit Guar. Corp., 634 F.2d 1013, 1025 n. 13 (6th Cir.1980) (“[W]e ... question the continued vitality of the Supreme Court’s reasoning in [Alton ].”); Chew v. E.R. Quesada, 182 F.Supp. 231, 232 (D.D.C.1960) (“The evidence is overwhelming that Alton is no longer controlling law.”). In both letter and spirit, Alton belongs to the long-discredited era of Lochner-style judicial activism. See Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905). That is, Alton was decided prior to the Court’s 1937 abandonment of intrusive judicial scrutiny of economic legislation under the rubric of substantive due process. See West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937); United States v. Carolene Prod. Co., 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234, (1938). See generally Bruce A. Ackerman, We the People: Foundations, 48-50 (1991); Morton J. Horowitz, The Warren Court and the Pursuit of Jus *488 tice, 50 Wash. & Lee L.Rev. 5, 5 (1993) (“[T]he -New Deal Revolution of 1937 ... fundamentally altered the relationship between the federal government and the states and between the government and the economy.”). Beginning with West Coast Hotel, due process review has metamorphosed into a creature of a different stripe.' For example, the “presumption of constitutionality” which now attaches to all “legislative Acts adjusting the burdens and benefits of economic life,” Turner Elkhorn, 428 U.S. at 15, 96 S.Ct. at 2892, was absent from the Alton Court’s analysis. Indeed, in Gray, 467 U.S. at 733, 104 S.Ct. at 2719-20, the Supreme Court itself expressly declined a litigant’s invitation to “resuscitate” the Alton holding. As it had earlier done in Turner Elkhorn, 428 U.S. at 19, 96 S.Ct. at 2894, the Court instead “[a]ssum[ed]” that Alton ‘“retains vitality’ despite the changes in judicial review of economic legislation that have occurred in the ensuing years,” and then proceeded to distinguish the case on its facts. 467 U.S. at 733, 104 S.Ct. at 2720.
We need not attempt here a definitive measurement of Alton’s jurisprudential vital signs because the provisions of the Coal Act are easily distinguishable from those of the Railroad Retirement Act. First, the Alton Court found that the pre-enactment railroad retirees, who became eligible for employer-funded pensions under the Railroad Retirement Act, had retired without any expectation, legitimate or otherwise, of receiving pension benefits. 295 U.S. at 349, 55 S.Ct. at 762. The Court held that “this requirement ... imposes for the future a burden never contemplated by either party when the earlier relation existed or when it was terminated.” Id. By contrast, every court to examine the 1974 and subsequent Wage Agreements has concluded that they created a legitimate expectation of lifetime health benefits for retired miners. As this court observed in Chateaugay, 945 F.2d at 1210, retired coal miners “are guaranteed provision of health benefits for life under the collective bargaining agreement.” Accord Royal Coal II, 826 F.2d at 282 (“At the outset of our analysis we note that we agree with the district court’s conclusion that the intentions of the parties in providing for retirement health benefits was to guarantee their provision for life.”); Nobel, 720 F.Supp. at 1178 (“We find that the language [of the Wage Agreements] confers a right to benefits for the lifetime of the pensioner.”). In Barrick Gold Exploration, Inc. v. Hudson, 823 F.Supp. 1395, 1405 (S.D.Ohio 1993), aff'd, 47 F.3d 832 (6th Cir.1995), the court found that the Wage Agreement's “promised lifetime health benefits to miners.” In Templeton Coal Co., Inc. v. Shalala, 855 F.Supp. 990, 1003 (S.D.Ind.1993), the court upheld the constitutionality of the Coal Act even as applied to companies who signed only pre-1974 Wage Agreements:
Congress is well within its authority in viewing the history of collective bargaining in the mining industry to determine that operators like these Plaintiffs created an atmosphere that promised lifetime health benefits to those who would retire from the industry. In return, such operators received labor at the time.
Consistent with such findings, the Coal Commission rested its legislative recommendations upon the premise that a legitimate expectation of lifetime health benefits had been created. Coal Comm. Rpt. at vii, 1, JA 397, 405. Accordingly, we hold that, unlike the provisions challenged in Alton, the Coal Act operates to enforce a legitimate expectation generated by the parties in the course of their voluntary contractual relationship.
Second, the Alton Court’s finding of irrationality derived in large part from its finding that, by making benefits available to all those employed by a railroad during the year preceding the statute’s enactment, the Railroad Retirement Act extended pensions “to thousands who have been unfaithful and for that cause have been separated from the service, or who have elected to pursue some other calling, or. who have retired from the business, or who have been for other reasons lawfully dismissed.” 295 U.S. at 349, 55 S.Ct. at 762. The Court believed that providing pensions to such persons could not “in reason or common sense” be said to advance the statute’s objective of promoting “efficiency or safety in the future operation of the railroads.” Id. The Court complained that “as to some of the railroad companies [the *489 Railroad Retirement Act] constitutes a naked appropriation of private property upon the basis of transactions with which the owners of the property were never connected.” Id. at 350, 55 S.Ct. at 762. By contrast, under the Coal Act eligibility for health benefits extends only to those miners who accumulated twenty years of classified labor in the coal industry or who were disabled in the course of their employment. Unlike the Railroad Retirement Act, the Coal Act links, operator liability to previous employment relationships by assigning beneficiaries to their former employers where possible. As a signatory to the 1974 and subsequent Wage Agreements, LTV joined in the mining industry’s collective assumption of responsibility for the “orphaned” retirees’ benefits. Having negotiated over and contributed to the' 1974 Benefit Trust for over a decade, LTV cannot now insist that it was never connected with the problem of the “orphans.” Unlike the employers in Alton, LTV has by its own voluntary actions formed the connections and undertaken the responsibilities which now constitute the basis of its liability under the Coal Act. In light of these critical distinctions between Alton and the case before us, we conclude that Alton is not controlling.
We turn then to an assessment of LTVs claims under the post-Alton economic regulation cases. LTV claims that it is arbitrary and irrational to require a former party to time-limited contracts, whose obligations have been fulfilled and terminated, to now finance the provision of lifetime health benefits not only to former employees but also to a number of retired miners who at no time worked for LTV. Absent the Coal Act, LTV argues that both it and the UMWA miners got what they bargained for: The miners got contributions to the Benefit Trusts during the term of the agreement, and LTV got the right to withdraw from the system upon the expiration of the 1984 Wage Agreement. With the Coal Act, says LTV, the government has not merely rewritten our old contracts with our own former employees, it has created from whole cloth entirely new contracts obligating us to provide lifetime health benefits to retirees we never employed. In short, LTV argues, Congress’s retroactive construction of new liabilities on the .rubble of past acts violates the Due Process Clause, particularly where the parties involved have already fulfilled their contractual obligations to one another.
We agree with LTVs contention that the Coal Act has some retrospective effect. To some degree, the Coal Act “upsets otherwise settled expectations,” and “impose[s] a new duty or liability based on past acts.” Turner Elkhorn, 428 U.S. at 16, 96 S.Ct. at 2893. As LTV points out, “[retroactive legislation presents problems of unfairness that are more serious than those posed by prospective legislation, because it can deprive citizens of legitimate expectations and upset settled transactions.” General Motors Corp. v. Romein, 503 U.S. at 191, 112 S.Ct. at 1112. Yet it is equally clear that the presence of some retroactivity in no way alters our deferential standards of review. As a unanimous Court held in Gray, 467 U.S. at 729, 104 S.Ct. at 2717-18:
[T]he strong deference accorded legislation in the field of national economic policy is no less applicable when that legislation is applied retroactively. Provided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches.
The Court has cautioned that “[t]he retrospective aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former,” suggesting that, for example, theories of deterrence and punishment may be insufficient to justify the retrospective imposition of liability. Turner Elkhorn, 428 U.S. at 17, 96 S.Ct. at 2893. Nevertheless, the governing standard of review in this case remains that of arbitrariness and irrationality.
In Turner Elkhorn, coal miners challenged the constitutionality of provisions of the Black Lung Benefits Act of 1972, 30 U.S.C. §§ 901 — 15, that required operators to pay benefits to miners who. contract pneumoconi-osis and their survivors even if the miners had ceased employment in the coal industry *490 before the effective date of the Act. 428 U.S. at 8-10, 96 S.Ct. at 2889-90. As in this case, the plaintiffs in Turner Elkhom argued that the Due Process Clause prevented Congress from requiring them to assume responsibility for the former miners, individuals whose work in the industry had terminated prior to the passage of the statute and who had never been promised any of the benefits the operators were required to fund under the statute. The Court held that:
the imposition of liability for the effects of disabilities bred in the past is justified as a rational measure to spread the costs of the employees’ disabilities to those who have profited from, the fruits of their labor [ — ] the operators and the coal consumers.
428 U.S. at 18, 96 S.Ct. at 2893. As the Court noted elsewhere, “[i]t is surely proper for Congress to legislate retrospectively to ensure that the costs of a program are borne by the entire class of persons that Congress rationally believes should bear them.” Sperry, 493 U.S. at 64-65, 110 S.Ct. at 396 (upholding retroactive effect of legislation permitting deduction of user fee from awards of United States-Iran Tribunal).
In Gray, the Court considered a due process challenge to the retroactive application of the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. §§ 1381-1461 (“MPPAA”), a. statute requiring employers withdrawing from multiemployer pension plans to pay their pro rata share of the plan's vested unfunded liabilities. The Court concluded that Congress was “eminently rational” in imposing the MPPAA’s obligations retroactively in order that employers who withdrew from plans during consideration of the proposed legislation would not thereby achieve any advantage. 467 U.S. at 730-31, 104 S.Ct. at 2718-19. In 1993,.the Supreme Court in Concrete Pipe again upheld the MPPAA against a challenge that it improperly imposed withdrawal liability upon an employer who had contributed to a pension plan prior to the enactment of the statute and who had terminated its contractual liability for additional contributions. See — U.S. at -, 113 S.Ct. at 2274-75. The Court quoted its holding in Gray that “legislation readjusting rights and benefits is not unlawful solely because it upsets, otherwise settled expectations,” id. at -, 113 S.Ct. at 2287, and reaffirmed that the statute was “subject to due process review only for rationality,” id. at -, 113 S.Ct. at 2289.
LTV’s efforts to distinguish Turner Elk-hom, Gray, and Concrete Pipe are unpersuasive. In essence, LTV suggests that the rational bases accepted by the Court in those cases constitute a closed set of permissible justifications. On the contrary, these cases all reiterate the principle'that retrospective cost-spreading statutes must be upheld if there exists a rational connection between a legitimate legislative purpose and the chosen statutory means.
, We have no difficulty discerning .in the Coal Act a ‘ rational scheme to achieve a legitimate legislative purpose. As the district court below accurately noted, the critical flaw in LTV’s claim “that there is no rational relationship between its past payments for its former employees’ health benefits and the requirement that it now pay for those benefits, and those of certain orphan beneficiaries, for the balance of those beneficiaries’ lives, is that at least between 1974 and 1986, LTV was signatory to a series of NBCWAs that included language that gave retired coal miners a legitimate expectation of lifetime health benefits.” In re Chateaugay, 163 B.R. at 963. LTV’s Coal Act liability arises out of an untenable situation of LTV’s own making. With one hand, LTV promised the coal industry’s miners that they would receive health care benefits for life. With the other hand, LTV secured a contractual ability to leave the coal industry, unload its retirees into the 1974 Benefit Trust, and thereby free itself of financial responsibility for the fulfillment of its promise. By exercising that contractual right and “orphaning” its retirees in 1986, LTV became a prime contributor to the financial crisis in the Benefit Trusts. The district court stated it well:
While LTV might well have expected that other coal operators would be required to pay for those benefits after LTV left the coal mining industry, LTV also could reasonably have anticipated that the 1950 and 1974 Benefit Trusts would not be able to support the financial burdens imposed *491 upon them as a result of escalating health care costs, the aging of the beneficiary population and the “dumping” of beneficiaries into the 1974 Benefit Trust, both by companies going out of business totally and companies who, like LTV, ceased coal mining operations but remained in business in other industries.

Id.

We find eminently rational Congress’s decision to apportion liability for the promised lifetime health benefits among all the companies that collectively made the promise. Cf. National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co., 470 U.S. 451, 477, 105 S.Ct. 1441, 1457-58, 84 L.Ed.2d 432 (1985) (Congress acted rationally in requiring private railroads to pay a portion of the cost of rail travel passes provided to railroad employees by Amtraek in part because “the railroads, rather than the taxpayers, were responsible for the creation of the moral obligation” to provide such privileges). As an entity that benefitted directly from the effect of that promise on the availability and quality of UMWA labor, LTV cannot now maintain that Congress acted arbitrarily in assigning to LTV a proportional share of the future cost of fulfilling that promise.
In light of the mounting crisis in the UMWA benefit trusts, the resulting strikes and disruptions in the coal fields, and the very real danger that 200,000 retirees would fall onto government assistance unless the coal industry were held to its earlier promises of lifetime health benefits, we hold that Congress acted neither arbitrarily nor irrationally by shifting the burden of the crisis onto those most responsible for creating it. Nor do w.e find evidence of arbitrariness or irrationality in the Coal Act’s formulas for assigning retirees to former employers and for calculating pro rata shares of death benefits and unassigned retiree benefits. Our conclusion is buttressed by Congress’s provision of mitigating transfers that first eliminate and then substantially reduce LTV’s liability for retired miners that LTV never employed.
LTV separately argues that the Coal Act is arbitrary or irrational due to its “unprecedented degree of retroactivity.” LTV Br. at 31. The proposition that the Due Process Clause imposes a time limit on a law’s retrospective effect elicits no support from the case law and runs afoul of the numerous decisions upholding the constitutionality of the unlimited retrospective temporal reach of the Comprehensive Environmental Response, Compensation, and Liability Act (“CERCLA”), 42 U.S.C. §§ 9601-9657. See, e.g., United States v. Monsanto Co., 858 F.2d 160, 173-74 (4th Cir.1988), cert. denied, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989); United States v. Northeastern Pharmaceutical & Chem. Co., 810 F.2d 726, 741 (8th Cir.1986), cert. denied, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); United States v. Hooker Chems. & Plastics Corp., 680 F.Supp. 546, 556 (W.D.N.Y.1988). We do not agree that the scope of the retrospective effect associated with the Coal Act is “unprecedented,” or even notably great. As with CERCLA and the Black Lung Benefits Act upheld in Turner Elkhom, the Coal Act triggers current and future liabilities on the basis of past actions, in this case the hiring and firing of workers and the signing of a National Bituminous Coal Wage Agreement. The Coal Act contains no requirement that signatory operators pay for health benefits delivered prior to the effeetivé date of the statute. Thus, the financial impact of the Coal Act on assigned operators is strictly prospective: only the weight and duration of the funding burdens vary according to past acts. Our review of the record convinces us that the degree of retrospective effect imposed on LTV by the Coal Act is commensurate with LTV’s share of responsibility for the coal miner retiree health benefit crisis as rationally apportioned by Congress. In any event, we find no support for LTV’s argument that the Coal Act’s “degree of retroac-tivity” violates the Due Process Clause.

B. Takings Clause

We agree with the district court that its exercise of jurisdiction over LTV’s Takings Clause claim was proper pursuant to 28 U.S.C. § 1331(a). We find no merit to the government’s suggestion that the Tucker Act, 28 U.S.C. § 1491(a), acts to remove from the federal district courts jurisdiction over an *492 action for declaratory relief where no money damages have been requested. The Tucker Act vests original jurisdiction over suits seeking compensation from the United ■ States under the Constitution in the United States Court of Federal Claims. The jurisdiction of the Federal Claims Court over such actions is exclusive, except that the federal district courts have concurrent jurisdiction over cases in which the amount in controversy is less than $10,000. See 28 U.S.C. § 1346(a)(2). The jurisdiction of the Claims Court depends entirely upon the presence of a claim for money damages. See Gentry v. United States, 546 F.2d 343, 355 (Cl.Ct.1976) (“Our authority to issue a declaratory judgment is limited_ We are authorized to do so only where ‘it is tied and subordinate to a monetary award.’ ”) (quoting Austin v. United States, 206 Ct.Cl. 719, 723, cert. denied, 423 U.S. 911, 96 S.Ct. 215, 46 L.Ed.2d 140 (1975)); Kennedy v. United States, 19 Cl.Ct. 69, 75 (Cl.Ct.1989) (dismissal is required where the relief sought is other than monetary compensation). Thus, the question of jurisdiction in this case masks a broader question of ripeness: Can a takings claim ever be brought in a district court without first seeking compensation in the Court of Federal Claims?
On their face, the Supreme Court’s decisions on federal Takings Clause jurisdiction have not been consonant. Certain obiter dicta, if taken literally, would preclude our jurisdiction over LTV’s takings claim on grounds of ripeness. See First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, 482 U.S. 304, 314, 107 S.Ct. 2378, 2385, 96 L.Ed.2d 250 (1987) (The Fifth Amendment “does not prohibit the taking of private property, but instead places a condition on the exercise of that power.”); Williamson County Regional Planning Comm’n v. Hamilton Bank, 473 U.S. 172, 195, 105 S.Ct. 3108, 3121, 87 L.Ed.2d 126 (1985) (“[Tjakings claims against the Federal Government are premature until the property owner has availed itself of the process provided by the Tucker Act.”); Preseault v. Interstate Commerce Comm’n, 494 U.S. 1, 11, 110 S.Ct. 914, 921, 108 L.Ed.2d 1 (1990) (The Takings Clause is satisfied when at the time of the taking the government makes available a “reasonable, certain and adequate provision for obtaining compensation” (internal quotations and citations omitted).); see also Regional Rail Reorganization Act Cases, 419 U.S. 102, 126, 95 S.Ct. 335, 349-50, 42 L.Ed.2d 320 (1974) (To determine whether a district court has jurisdiction over a statutory takings claim, the proper inquiry is not whether the statute “expresses an affirmative showing of congressional intent to permit recourse to a Tucker Act remedy,” but rather “whether Congress has in the [statute] withdrawn the Tucker Act grant of jurisdiction to the [Claims Court] to hear a suit involving the [statute] ‘founded ... upon the Constitution.’”); Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1019, 104 S.Ct. 2862, 2881, 81 L.Ed.2d 815 (1984) (District court jurisdiction over takings claims requires a demonstration of Congress’s “unambiguous intention to withdraw the Tucker Act remedy.”). Yet in Duke Power, the Court appears to have explicitly endorsed district courts’ exercise of jurisdiction over declaratory judgment actions founded on the Takings Clause, even when no prior attempt to secure compensation in the Federal Claims Court has been made.[5] Consistent with the latter approach, the Court has in several recent *493 cases adjudicated takings claims on appeal from district courts without reference to Tucker Act jurisdiction or a finding of “unambiguous” Congressional intent to withdraw it. See Concrete Pipe, — U.S. at -, 113 S.Ct. at 2289-92; Connolly v. Pension Benefit Guaranty Corp., 475 U.S. 211, 221-28, 106 S.Ct. 1018, 1024-28, 89 L.Ed.2d 166 (1986). Thus, we are left with the task of reconciling the broad jurisdictional statements of Pre-seault, Williamson County, and Monsanto with the more specific language of Duke Power in light of the Court’s actual exercise of jurisdiction in Concrete Pipe and Connolly. We resolve this apparent inconsistency by looking not so much to what the Supreme Court has said, but to what it has doné. We conclude that a distinction must be drawn between (a) statutes burdening real and tangible property, and (b) those requiring direct transfers of money to the government. The jurisdictional ripeness analysis must take account of the nature of the alleged statutory taking. The Williamson County/Preseault approach — that is, withholding district court jurisdiction on grounds of ripeness until a plaintiff shows that a claim for compensation in the Federal Claims Court has been or would be unsuccessful — has been applied only where real or tangible property was physically invaded, regulated, or otherwise burdened by legislative action. As the Court’s exercise of jurisdiction in Connolly and Concrete Pipe makes clear, however, different rules apply to statutes mandating financial contributions to benefit funds. We hold that where the challenged statute requires a person or entity to pay money to the. government, it must be presumed that Congress had no intention of providing compensation for the deprivation through the Tucker Act. Common sense dictates such a presumption. For example, in the case of the Black Lung Act, which required mining companies to contribute funds for the benefit of afflicted former miners, it would make no sense to presume that Congress intended for the Treasury to compensate mining companies for their contributions because the Act lacks an express Congressional statement to the contrary. Such a presumption would tend to nullify all existing legislation adjusting the benefits and burdens of economic life: Every dollar paid pursuant to a statute would be presumed to generate a dollar of Tucker Act compensation. Instead, we hold that the Williamson County/Preseault presumption of Tucker Act availability must be reversed where the challenged statute, rather than burdening real or physical property, requires a direct transfer of funds to the government.[6] Otherwise, we would have to, hold, as we cannot, that the Supreme Court wrongly exercised jurisdiction over the takings claims in Concrete Pipe and Connolly.
In any event, our jurisdiction over this case is proper in light of the fact that LTV seeks only declaratory relief on its takings claim. As noted above, under the Tucker Act the Federal Claims Court has no jurisdiction where no claim for monetary relief is involved. Given the clear availability of declaratory relief for asserted Takings Clause violations, see Duke Power, 438 U.S. at 71, 98 S.Ct. at 2629, federal jurisdiction over those claims must therefore vest in the district courts.[7]
*494 We ■ turn next to the merits of LTV’s takings claim. Where legislation adjusting the benefits and burdens of economic life withstands due process review, “it would be surprising indeed to discover” that Congress had thereby committed an unconstitutional taking. Connolly, 475 U.S. at 223, 106 S.Ct. at 1025. “Given the propriety of the governmental power to regulate, it cannot be said that the Taking Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another.” Id. Our task is to conduct an “ad hoc, factual ,inquir[y]” into the circumstances of this case. Id. at 224, 106 S.Ct. at 1026. We are to attach “particular significance” to three factors: “(1) ‘the economic impact of the regulation on the claimant’; (2) ‘the extent to which the regulation has interfered with distinct investment-backed expectations’; and (3) ‘the character of the governmental action.’ ” Id. at 224-25, 106 S.Ct. at 1026 (quoting Penn Central Transp. Co. v. New York City, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)). We examine each factor in turn.
Where a regulation mandates contributions to a benefit fund, the proper yardstick of economic impact is that of proportionality. Our assessment of economic impact “is not made in a vacuum ... but directly depends on the relationship between the employer and the plan to which it had made contributions.” Id., 475 U.S. at 225, 106 S.Ct. at 1026. We conclude that .LTV has failed to show that its Coal Act liability will be “out- of proportion to its experience” with the 1950 and 1974 Benefit Trusts. Id. at 226, 106 S.Ct. at 1027.
LTV’s obligation to contribute to the Combined Fund derives from Congress’s rational decision to require the entire class of signatory coal mine operators to fulfill their promises of lifetime health benefits for retirees. As a leading member of the BCOA, LTV participated in the collective bargaining that created the 1950 and 1974 Benefit Trusts and in their operation for nearly four decades. Moreover, the employment relationship supplies the rational link by which LTV’s Coal Act premiums are tied to its past experience with the benefit plans. As with the other signatory operators, the size of LTV’s annual contribution depends entirely on the number of its former employees receiving benefits from the Combined Fund. By thus mooring a given company’s funding obligations to a legitimate measure of its prior benefit from the UMWA health care system, the Coal Act rationally apportions future financial responsibility according to past participation. Consequently, we are not confronted with a case of Congress “‘forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.’ ” Penn Central, 438 U.S. at 123-24, 98 S.Ct. at 2659 (1978) (quoting Armstrong v. United States, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960)). We believe that LTV’s liability under the Coal Act permissibly reflects its experience with the Benefit Trusts and the National Bituminous Coal Wage Agreements.
Furthermore, as .the district court observed, “[t]he fact that [the Coal] Act has provisions intended to mitigate its economic impact also has been, held to be a factor that weighs in favor of its constitutionality.” In re Chateaugay, 163 B.R. at 960. See also Connolly, 475 U.S. at 225-26, 106 S.Ct. at 1026-27. We note that while the assigned operators may eventually have to bear some of the costs of providing benefits to the industry’s “orphaned” retirees, the Coal Act contains several provisions mitigating that burden. First, the transfer of $210 million from the 1950 Pension Fund in the Combined Fund’s first three fiscal years will eliminate the unassigned beneficiary and death benefit premiums for all assigned operators in at least the first two of those years. The second series of transfers from the Abandoned Mine Reclamation Fund will continue until at least 2004, potentially totalling hundreds of millions of dollars. By thus minimizing LTV’s financial responsibility for retirees it never employed, the Coal Act reinforces the *495 centrality of the employment relationship to the imposition of liability.
Neither do we find that the size of LTV’s Coal Act assessments, viewed in isolation, render the burden constitutionally impermissible. As the district court observed, “very large obligations, or diminutions in value or net worth have been upheld on numerous occasions.” Slip op. at 10-11, JA 27-28 (citing cases). “[M]ere diminution in the value of property, however serious, is insufficient to demonstrate a taking.” Concrete Pipe, — U.S. at -, 113 S.Ct. at 2291 (upholding required payment equalling 46% of shareholder equity). See also Connolly, 475 U.S. at 222, 106 S.Ct. at 1024-25 (25% of company’s net worth). We note that LTV’s allegations about the oppressiveness of these assessments are substantially undermined by LTV’s own words. At its bankruptcy confirmation hearing, LTV’s chief financial officer conceded that the Coal Act obligations will not interfere with LTV’s ability to emerge from bankruptcy and return to profitability. Transcript of Confirmation Hearing at 135-56, In re Chateaugay, No. 86-B-11270 (Bankr.S.D.N.Y. May 26, 1993) (“We will waive this condition precedent to effectiveness. ... This liability was included in all of our projections and we are comfortable with the viability of the company, even if it still has to service this obligation.”); JA 561-62.
The second factor to be considered is the degree to which the Coal Act interferes with LTV’s reasonable investment-backed expectations. As noted above, we believe that LTV could reasonably have expected to be held accountable for its promise of lifetime health benefits to its workers. LTV argues that the Coal Act destroys the legitimate contractual expectations of the parties to the NBCWAs. LTV points out that the Wage Agreements expressly limited the duration of signatory operators’ duty to pay for those promises. Though it is true that LTV’s contractual liability has been held to have terminated at the expiration of the 1984 Wage Agreement, see In re Chateaugay, 945 F.2d at 1211, the terms of the NBCWAs cannot limit Congress’s authority to enact subsequent legislation requiring the coal industry to fulfill its promises. As Connolly explained:
“Contracts ... cannot fetter the constitutional authority of Congress. Contracts may create rights of property, but when contracts deal with a subject matter which lies within the control of Congress, they have a congenital infirmity. Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them.” Norman v. Baltimore & Ohio R.R. Co., 294 U.S. 240, 307-08, 55 S.Ct. 407, 416, 79 L.Ed. 885 (1935).
If the regulatory statute is otherwise within the powers of Congress, therefore, its application may not be defeated by private contractual provisions. For the same reason, the fact that legislation disregards or destroys existing contractual rights does not always transform the regulation into an illegal taking.
475 U.S. at 223-24, 106 S.Ct. at 1025. Accord Concrete Pipe, — U.S. at -, 113 S.Ct. at 2290 (quoting Connolly). A regulatory statute which, like the Coal Act, does not authorize the United States to take anything for its own use and only “nullifie[s] a contractual provision limiting liability by imposing an additional obligation that is otherwise within the power of Congress to impose” . does not violate the Takings Clause. Connolly, 475 U.S. at 224, 106 S.Ct. at 1025-26. We hold that the contractual limitation on LTV’s liability to the Benefit Trusts fails to obstruct Congress’s ability to impose a new and ongoing liability.
As to the legitimacy of LTV’s alleged expectations, we reject LTV’s contention that it was reasonable to expect to be held no more accountable than society at large for the health care of its retired coal miners. As a voluntary, active participant in the creation and operation of the Benefit Trusts, LTV was familiar with the federal government’s involvement in the regulation of the UMWA and other benefit plans. Against that backdrop, LTV’s claim that it expected to unload its retiree health care liabilities onto the remaining operators without ever paying another dollar rings hollow. In light of the fact that LTV benefitted enormously from the *496 Wage Agreements, from the labor of its former employees, and from the promise of lifetime health benefits that in part attracted them, any interference wrought by the Coal Act with LTV’s expectations was interference with unreasonable, not reasonable, expectations.
We turn finally to the nature of the governmental action involved. “It is well settled that a ‘ “taking” may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.’ ” Keystone Bituminous Coal Ass’n v. DeBenedictis, 480 U.S. 470, 490 n. 18, 107 S.Ct. 1232,1244 n. 18, 94 L.Ed.2d 472 (1987) (quoting Penn Central, 438 U.S. at 124, 98 S.Ct. at 2659) (citations omitted). The Coal Act entails no physical invasion of property, nor any permanent confiscation of LTV’s assets for governmental use. On the contrary, the Coal Act squarely falls within the category of legislation that serves to adjust the benefits and burdens of economic life on behalf of the common good.
In fact, we find that the Coal Act closely resembles the withdrawal liability provisions of the MPPAA found constitutional in Concrete Pipe, - U.S. at -, 113 S.Ct. at 2289-92, and Connolly, 475 U.S. at 221-28, 106 S.Ct. at 1024-28. The MPPAA required any employer withdrawing from multi-em-ployer pension plans to pay its pro rata share of the plan’s vested unfunded liabilities. As did the MPPAA, the Coal Act seeks to restore financial stability and viability to multiemployer benefit plans threatened by employer withdrawals. Both Acts calculated financial contributions on a proportional basis, reflecting a given employer’s prior experience with the plan. The fact that Congress has required LTV to transfer resources to the Combined Fund for the benefit of a discrete, private group&emdash;in this case, LTV’s former employees and some of the industry’s “orphaned” retirees&emdash;does not by itself constitute a taking. Congress’s authority to “create[ ] burdens for some that directly benefit others” is well established. Connolly, 475 U.S. at 223, 106 S.Ct. at 1025. By holding LTV to its promises to prevent the collapse of the coal industry’s retiree health benefit scheme, the Coal Act surely serves to “promote[ ] the common good.” Id. at 225, 106 S.Ct. at 1026.
In conclusion, we find that all three factors weigh against a finding that the Coal Act effects an illegal taking. Accordingly, we hold that the Coal Act does not violate the Takings Clause.
III. BANKRUPTCY CLAIMS
In addition to its constitutional challenge, LTV claims that its Chapter 11 bankruptcy protections operate to relieve it of its Coal Act obligations. LTV claims that its Coal Act obligations constitute pre-petition debts which must now be disallowed because no timely proof of claim was filed. The district court analyzed these claims in detail and rejected LTV’s arguments. The district court further held that the assessments under the Coal Act are in the nature of a tax, therefore according administrative priority treatment to those assessments accruing during the bankruptcy period. We agree.
The critical issue before us is the scope of the term “claim” as employed by the Bankruptcy Code. If the Combined Fund’s premium assessment is a “claim” against LTV that existed prior to the filing of the petition, then those premiums must now be disallowed. The Code defines a “claim” as a “right to payment, whether or not such right is reduced to judgment, liquidated, unliqui-dated, fixed, contingent, matured, unma-tured, disputed, undisputed, legal, equitable, secured, or unsecured.” 11 U.S.C. § 101(5)(A). As this court noted in a prior iteration of this case, “Congress unquestionably expected this definition to have wide scope.” In re Chateaugay, 944 F.2d at 1003. In Pennsylvania Dep’t of Pub. Welfare v. Davenport, 495 U.S. 552, 558, 110 S.Ct. 2126, 2130-31, 109 L.Ed.2d 588 (1990), the Supreme Court reviewed the legislative history of the Bankruptcy Code and noted Congress’s intent to invest the term “claim” with the “broadest possible” scope so that “all legal obligations of the debtor ... will be able to be dealt with in a bankruptcy case.” *497 See H.R.Rep. No. 95-595, at 310 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6267. However broadly “claim” is understood, it is clear that the existence of a valid bankruptcy claim depends on (1) whether the claimant possessed a right to payment, and (2) whether that right arose before the filing of the petition. Looking to the plain language of the Bankruptcy Code, we must ascertain whether a “right to payment” existed at the time of LTV’s petition. ' In Davenport, the Court stated simply that “a ‘right to payment’ is nothing more nor less than an enforceable obligation_” 495 U.S. at 559, 110 S.Ct. at 2131.
A claim will be deemed pre-petition when it arises out of a relationship recognized in, for example, the law of contracts or torts. “A claim exists only if before the filing of the bankruptcy petition, the relationship between the debtor and the creditor contained all. of the elements necessary to give rise to a legal obligation — ‘a fight to payment’ — under the relevant non-bankruptcy law.” In re National Gypsum Co., 139 B.R. 397, 405 (N.D.Tex.1992).
We reject LTV’s contention that its Coal Act obligations arise out of pre-petition “consideration” for purposes of bankruptcy analysis. LTV argues that its contributions to the Combined Fund represent additional compensation for the labor of its former miners. We disagree. The obligations here at issue are exclusively statutory in origin and cannot be considered a “pay-back” for pre-petition labor. Coal Act premiums are no more compensation for past labor than- were those mandated by the Black Lung Act. Most important, they do not constitute the maturation of a right to payment that vested at the time labor was supplied. LTV’s liability to the Combined Fund is newly imposed by the Coal Act, not á revival of old contractual obligations. No right to payment on the part of the Combined Fund existed until the enactment of the Coal Act six years after the filing of LTV’s petition. Our conclusion in no way narrows the definition of the term “claim,” but rather represents a common sense recognition that its reach is not infinite.
In this case, the distinction between statutory and contractual obligations is of paramount importance. The cases cited by LTV for the proposition that its Coal Act liability constitutes consideration for pre-petition labor all involved unmatured or contingent contractual liabilities. See, e.g., PBGC v. LTV Corp., 875 F.2d 1008, 1019 (2d Cir.1989), rev’d, 496 U.S. 633, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990); Trustees of Amalgamated Ins. Fund v. McFarlin’s, 789 F.2d 98, 103-04 (2d Cir.1986). Thus, the existence of a prior'contractual liability for retiree health benefits, see In re Chateaugay, 945 F.2d at 1209, does not render pre-petition the later statutory imposition of retiree health care obligations by Congress.
Our conclusion is supported by the courts’ treatment of CERCLA liability in similar bankruptcy cases. In Matter of Penn Central Transp. Co., 944 F.2d 164 (3d Cir.1991), cert. denied, 503 U.S. 906, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992), the Third Circuit refused to find that a clean-up claim under CERCLA could exist prior to the enactment of the statute, even though the claim admittedly was based on pre-petition activities. While it is true that Matter of Penn Central was decided under the old Bankruptcy Act, which used a narrower definition of “claim” than the new Bankruptcy Code, the logic of that case is, as the district court pointed out, “equally applicable to the Code definition of a ‘claim,’ which-still requires a legal ‘right’ to be in existence at the time of the filing.” 154 B.R. at 419, JA 13. The mere fact that LTV’s retirees were employed by LTV pre-petition does not, in and of itself, render pre-petition all claims arising thereafter that may have any nexus to such employment. We agree with the district court that the Combined Fund’s “claims” under the Coal Act in this case “were not in any sense ‘contingent’ or ‘unmatured’ ... they simply did not exist.” Id. “[Wlhere there is no legal relationship defined at the time of petition,” that is, where the statute imposing the liability has not been enacted, “it would be impossible to find even the remotest ‘right to payment.’ ” Id. Therefore, LTV’s Coal Act obligations do not represent pre-petition claims that must be disallowed as untimely.
*498 We must next determine whether Coal Act contributions are “tax[es] ... incurred by the estate,” 11 U.S.C. § 503(b)(1)(B), entitled to administrative priority. In United States v. Feiring, 313 U.S. 283, 285, 61 S.Ct. 1028, 1029, 85 L.Ed. 1333 (1941), the Supreme Court held that tax priority “extends to those pecuniary burdens laid upon individuals or their property, regardless' of their consent, for the purpose of defraying the expenses of government or.of undertakings authorized by it.” The Court further refined its working definition in National Cable Television Ass’n v. United States, 415 U.S. 336, 340-41, 94 S.Ct. 1146, 1149, 39 L.Ed.2d 370 (1974), explaining that taxes are distinguished by their involuntary character. Working from these precedents, the Ninth Circuit summarized the four elements that characterize a tax:
(a) An involuntary pecuniary burden, regardless of name, laid upon the individuals or property;
(b) Imposed by, or under authority of the legislature;
(c) For public purposes, including the purposes of defraying expenses of government or undertakings authorized by it;
(d) Under the police or taxing power of the state.
In re Lorber Indus. of California, Inc., 675 F.2d 1062, 1066 (9th Cir.1982). Though decided under the prior Bankruptcy Act, this test is equally applicable under the Code. See, e.g., In re Continental Minerals Corp., 132 B.R. 757, 758 (Bankr.D.Nev.1991); In re O.P.M. Leasing Servs., Inc., 60 B.R. 679,. 680-81 (Bankr.S.D.N.Y.1986). It is uncontested that LTV’s Coal Act contributions are involuntary burdens .assessed by Congress. We .have already concluded above that the Coal Act serves a public purpose. As to the fourth factor, we agree with the district court that Congress’s enactment of the Coal Act was at least partially an exercise of the taxing power. The placement of the Coal Act at Subtitle J of the Internal Revenue Code of 1986 provides a strong indication of Congress’s intent, as does its granting of enforcement powers to the Secretary of the Treasury. 26 U.S.C. § 9707.
In sum, we agree with the district court that “the Coal Act obligations are appropriately described as ‘taxes’ due to their overwhelmingly involuntary nature, their explicitly stated public purpose, and their obvious potential to be imposed pursuant to the taxing power.” 154 B.R. at 422, JA 16. As a result, the portion of LTV’s Coal Act liability accruing during the pendency of its bankruptcy is entitled to treatment as an administrative expense of the estate pursuant to section 507(a)(1). The remainder of LTV’s obligations was not dischargeable in bankruptcy and is an obligation of the reorganized LTV.
IV.- CONCLUSION
We hold today that the Coal Act neither violates LTV’s due process rights nor effects an illegal taking of property without just compensation.[8] In addition, we find that LTV’s Coal Act liability does not constitute a pre-petition claim that must be disallowed under the Bankruptcy Code, but must rather be considered a tax entitled to administrative priority during the pendency of the bankruptcy.
The judgments below are affirmed and the ease is dismissed.

. The four original members of the BCOA were Jones & Laughlin Steel Corporation ("J & L”), Youngstown Sheet and Tube Corporation (“Youngstown”), Republic Steel Corporation ("Republic”), and Olga Coal Company ("Olga”). Each of these companies was represented on the first BCOA Board of Directors in 1950. In 1984, LTV Steel was formed by the merger of J & L, Youngstown, and Republic; in addition, LTV Steel currently owns the majority interest in Olga.

. For purposes of simplicity, and where appropriate, we hereafter use the terms “retiree,” "employee” and "retired miner” to include all related qualified beneficiaries, including spouses, widows, and dependents.

. The 1952 amendments raised the signatory operators' contribution to forty cents per ton of coal mined. Also, the 1964 amendments levied a fee of eighty cents per ton of coal purchased by signatory operators from non-UMWA coal mines.

. Citations to "JA_" refer to the parties’ Joint Appendix.

. In Duke Power, a case concerning a statutoiy limit on utility liability for nuclear disasters, the Court stated:
Mr. Justice Rehnquist [in dissent] suggests that appellees' "taking” claim will not support jurisdiction under § 1331(a), but instead that such a claim can be adjudicated only in the Court of Claims under the Tucker Act. We disagree. Appellees are not seeking compensation for a taking, a claim properly brought in the Court of Claims, but are now requesting a declaratory judgment that since the [challenged statute] does not provide advance assurance of adequate compensation in the event of a taking, it is unconstitutional. As such, appel-lees' claim tracks quite-closely that of the petitioners in the Regional Rail Reorganization Act Cases .... which were brought under § 1331 as well as the Declaratoiy 'Judgment Act.... While the Declaratory Judgment Act does not expand our jurisdiction, it expands the scope of available remedies. Here it allows individuals threatened with a taking to seek a declaration of the constitutionality of the disputed governmental action before potentially uncom-pensable damages are sustained.
438 U.S. at 71 n. 15, 98 S.Ct. at 2629 (citations omitted).

. Of course, at this point it is by no means clear that the Combined Fund constitutes part of the federal government. For purposes of establishing jurisdiction we need only determine whether “ 'the cause of action alleged is so patently without merit as to justify ... the court’s dismissal for want of jurisdiction.’" Hagans v. Lavine, 415 U.S. 528, 542-43, 94 S.Ct. 1372, 1381-82, 39 L.Ed.2d 577 (1974) (quoting Bell v. Hood, 327 U.S. 678, 683, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946)). Clearly, LTV's takings claim is "sufficiently substantial and colorable to sustain jurisdiction." Duke Power, 438 U.S. at 72, 98 S.Ct. at 2629.

. In connection with our jurisdictional holding, we emphatically reject the government's suggestion that the district court could " 'assume' subject matter jurisdiction for purposes of finding the statute constitutional." Brief of Donna E. Shalala, at 38 (citing Browning Ferris Indus. v. Muszynski, 899 F.2d 151, 159 (2d Cir.1990)). The government says, in effect, that this court’s jurisdiction is proper only if we agree with the government's arguments on the merits and hold that the Takings Clause has not been violated. In cases such as the one before us, the government would have federal courts dismiss actions for want of subject matter jurisdiction whenever the Takings Clause has been violated. We emphatically reject such reasoning. The existencé of federal subject matter jurisdiction over a given case does not, and indeed cannot, turn upon its eventual resolution on the merits. Among other doctrinal and analytic infirmities, every such dis *494 missal would necessitate an advisory opinion in contravention of the “case or controversy” requirement of Article III.

. Our decision is thus consistent with the rulings of every other court to examine the constitutionality of the Coal Act. See Barrick Gold Exploration, Inc. v. Hudson, 47 F.3d 832 (6th Cir.1995) (upholding decision of Congress not to credit signatories to 1988 Wage Agreement for withdrawal payments made to Benefit Trusts); Blue Diamond Coal Co. v. Shalala, 174 B.R. 722 (E.D.Tenn.1994) (upholding application of Coal Act to signatories of pre-1974 NBCWAs); Templeton Coal Co., Inc. v. Shalala, 855 F.Supp. 990 (S.D.Ind.1993) (same).