PARKER, Circuit Judge:
Goldman, Sachs & Co. (“Goldman”), First Manhattan Co. (“First Manhattan”), Firmanco Associates (“Firmanco”), Daniel Rosenbloom (together with First Manhattan and Firmanco, the “First Manhattan Appellants”), Panex Industries, Inc. Stockholders Liquidating Trust (the “Panex Trust”), Michael C. deBaecke as successor trustee to the Panex Trust, Andreas Gal, *147 and Paul Lazare[1] (together with Gal, the “Laga Appellants”), appeal from the judgment of the United States District Court for the Southern District of New York (Lawrence M. McKenna, Judge) (the “District Court”) entered February 5, 1999, affirming the Order of the United States Bankruptcy Court for the Southern District of New York (Cornelius Blackshear, Bankruptcy Judge) (the “Bankruptcy Court”) entered June 23,1997, denying the motion made by Goldman and joined by the other appellants to enforce the permanent injunction in the final decree (the “Final Decree”) in the bankruptcy case of Duplan Corporation (“Duplan” or the “Debtor”) and Duplan Fabrics, Inc. (together, the “Debtors”). Appellants argue that appellees’ claims under the Comprehensive Environmental Response, Compensation and Liability Act of -1980 (“CERCLA”) §§ 107 & 113, 42 U.S.C. §§ 9607 & 9613, the Resource Conservation and Recovery Act of 1976 (“RCRA”) § 7002, 42 U.S.C. § 6972, and the common law, asserted against them as distributees of Duplan, were discharged in the Duplan bankruptcy proceeding and therefore, the Final Decree should be enforced to prohibit further proceedings on those claims.
The Bankruptcy Court concluded that the Final Decree discharged only claims that arose prior to the filing of the petition, and that appellees’ CERCLA claims arose at the earliest upon the enactment of CERCLA in 1980, after the filing of the petition. The Bankruptcy Court thus concluded that the Final Decree did not discharge appellees’ CERCLA claims. Although appellants also asserted that the RCRA and common law claims against them were discharged in bankruptcy, the Bankruptcy Court denied the motion without specifically addressing the RCRA or common law claims.- For the following reasons, we agree with the District Court’s affirmance of the decision of the Bankruptcy Court to deny enforcement of the Final Decree as to the CERCLA claims. We conclude that the RCRA claims fail as a matter of law and affirm the denial of enforcement as to the RCRA claims. We also conclude that further factual development is needed on the common law claims. We therefore affirm in part, and vacate and remand in part for further proceedings.
I. BACKGROUND -
A. Duplan’s Bankruptcy
Before declaring bankruptcy, Duplan was a publically traded Delaware corporation engaged in the textile industry. In 1970, Duplan acquired Laga Industries, Ltd. (“Laga”), a Virgin Islands corporation that operated a textile manufacturing facility in Tutu, St. Thomas (the “Laga Facility”). After the acquisition, the former owners of Laga, appellants Gal and La-zare, became officers of Duplan.
On August 31, 1976, Duplan filed a petition for relief in the United States Bankruptcy Court for the Southern District of New York under Chapter XI of the Bankruptcy Act of 1898, as amended through August 31, 1976 (the “Act”).[2] By Order dated October 5, 1976, the bankruptcy court converted the ease into one for reorganization under Chapter X of the Act. The case then was transferred to the United States District Court for the Southern District of New York (Kevin T. Duffy, Judge), where the court appointed a reorganization trustee and established July 10, *148 1979 as the last day to file proofs of claims against the Duplan estate (the “Bar Date”).
By order dated August 28, 1979, Judge Duffy authorized the reorganization trustee to sell the Laga Facility, which had ceased operations in late 1978. On December 12, 1979, the reorganization trustee sold the Laga Facility to a New York partnership consisting of Gal and Lazare. In 1981, Laga was dissolved for failure to pay corporate franchise taxes.
Notice of the hearing on confirmation of the proposed plan of reorganization was published on April 27, 1981. After the confirmation hearing, by order dated June 4, 1981 (the “Confirmation Order”), the District Court confirmed the reorganization trustee’s Amended Plan of Reorganization (the “Plan”). For the purposes of implementing the Plan, the Confirmation Order permanently enjoined all creditors, from asserting, commencing, or continuing any “claims” against Duplan (which by order dated July 15, 1981 amending the Plan, was renamed Panex Industries, Inc. (“Panex”)).[3]
The Plan defines “creditor” as “the holder of a Claim” and “Claim” as:
[a]ny claim against either of the Debtors or the property of either of the Debtors, whether or not provable under Section 63 of the Bankruptcy Act, whether secured or unsecured, liquidated or unliq-uidated, fixed or contingent, which arose prior to the filing by the Debtors of the Petitions, proof of which was filed on or before July 10, 1979, or such other date as designated by the Court, and which has been or is hereafter allowed by the Court....
Plan at B-2. The Plan defines “Administrative Claims” in relevant part as “All costs and expenses of administration in connection with the Reorganization Cases ..., except [those] paid prior to the confirmation date.” Plan at B-2. Under the Plan, Duplan/Panex expressly assumed Administrative Claims for payment in the ordinary course of business. Plan at B-ll.
Pursuant to the confirmed Plan, Laga was formally dissolved, and creditors of Duplan received cash and new shares of stock in the reorganized company (now called Panex) in partial satisfaction of their claims against the Debtors. Goldman, First Manhattan, Gal, and Lazare were among the creditors of Duplan that received shares of Panex Stock. Firmanco, a now-dissolved limited partnership with First Manhattan as its General Partner, bought shares of Panex on the open market.
On June 27, 1983, the District Court entered the Final Decree, closing the bankruptcy case and approving the reorganization trustee’s final report. The Final Decree provided for a general discharge of the Debtors’ debts and liabilities (the “Discharge”)[4] and permanently enjoined all persons having claims against the Debtors from pursuing or commencing any suit against the Debtors, Panex or any party with an interest in the Debtors or Panex (the “Permanent Injunction”).[5] Both the *149 Discharge and the Permanent Injunction were subject to the other provisions in the Final Decree, and to the provisions in the Plan or the Confirmation Order. The Final Decree also provided that the court “shall retain jurisdiction” to enforce its orders and determine any issues related to the case. Final Decree at ¶ 9. Panex emerged from bankruptcy with over 300 shareholders, including Goldman, First Manhattan, Firmaneo, Gal, and Lazare.
B. The Dissolution of Panex
In September 1984, after Panex sold its major operating subsidiaries, the shareholders of Panex voted to dissolve Panex and adopted a plan of liquidation and dissolution. Panex made three distributions to shareholders over the next year, and on April 15, 1985, filed a Certificate of Dissolution with the Secretary of State of Delaware. On September 12, 1985, Panex created a liquidating trust, funded in the amount of six million dollars to cover any contingent claims against Panex. The shareholder-distributees were notified that the distributions to them were subject to recall if the Panex Trust proved insufficient to cover Panex’s liabilities. Lazare and Rosenbloom were appointed as trustees. In July 1987, in the absence of any significant claims, the Panex Trust distributed $4,850,000 from the Panex Trust to former Panex shareholders on a pro rata basis.[6]
C. The Tutu, Virgin Islands Contamination Litigation
In 1987, the Environmental Protection Agency (the “EPA”) found that the property adjacent to the Laga Facility (the “Tutu Site”) was contaminated with, inter alia, oil byproducts and perchloroethylene (“PCE”). In January 1988, the EPA instituted a contamination removal action at the Tutu Site. In March 1989, the EPA issued a determination that Texaco, Inc. and Texaco Caribbean, Inc. (collectively, “Texaco”), Esso Virgin Islands, Inc. and Esso Standard Oil Co. (Puerto Rico) (collectively, “Esso”) (together' with Texaco, the “Oil Companies”), and Laga, among others, were potentially responsible parties (“PRPs”) under CERCLA for the Tutu Site.
In April 1989, owners and lessees of the Tutu Site commenced an action in the United States District Court for the District of the Virgin Islands (the “Virgin Islands District Court”) asserting common law claims and CERCLA claims against Texaco, Esso, and others, for damages and response costs resulting from environmental contamination to the site. See Harthman v. Texaco, Inc. (In re Tutu Wells Contamination Litig.), 846 F.Supp. 1243 (D.Vi.1993). The Oil Companies later impleaded appellants, alleging that the Laga Facility had contributed to the contamination at the Tutu Site and alleging that the distributees of Panex remained liable for the clean-up costs. The Oil Companies *150 sought: (1) damages under the common-law theories of strict liability, contribution, restitution, and equitable disgorgement; (2) recovery of response costs under CERCLA §§ 107 and 113(f); and (3) an injunction .under the citizen suit provision of RCRA § 7002.[7]
D. The Proceedings Below
On July 2, 1996, Goldman moved by Order to Show Cause before Judge Duffy for an injunction enforcing the court’s Final Decree in the Duplan bankruptcy proceeding. Goldman argued that the Final Decree discharged the Oil Companies’ claims and enjoined them from further pursuing those claims against Panex, and a fortiori against Goldman. The First Manhattan Appellants, the Panex Trust, Gal and Lazare joined in the motion. Judge Duffy referred the motion to the Bankruptcy Court for resolution.
On October 2, 1996, the Bankruptcy Court held a hearing on Goldman’s motion (the “Hearing”) at which the parties made arguments but were not allowed to submit evidence. On June 11, 1997, the Bankruptcy Court denied Goldman’s motion, holding that the Final Decree did not discharge the Oil Companies’ CERCLA claims and did not enjoin the Oil Companies from pursuing their CERCLA claims against Goldman and the others. The Bankruptcy Court concluded that the Final Decree discharged only claims that arose prior to the filing of the petition, and that the CERCLA claims arose at the earliest upon the enactment of CERCLA in 1980, after the filing of the petition and after the Bar Date. Accordingly, the CERCLA claims did not constitute dis-chargeable claims within the meaning of the Final Decree and Plan. See generally In re Duplan Corp., 209 B.R. 324 (Bankr.S.D.N.Y.1997). The Bankruptcy Court also determined that the Permanent Injunction was coextensive with the Discharge, and thus did not enjoin the Oil Companies from pursuing their undischarged CERCLA claims. See id. at 333. Although Goldman’s motion also requested enforcement of the Permanent Injunction with respect to the Oil Companies’ common law and RCRA claims, the Bankruptcy Court did not address those claims specifically. Instead, the Bankruptcy Court:
found that the claims by the Oil Companies against Goldman and the intervening parties in the Virgin Islands Court were not discharged by the Final Decree because [the claims] did not come into existence until after the filing of Du-plan’s petition and after the last day to file claims against the estate.
Appellants filed separate Notices of Appeal from the Bankruptcy Court’s Order denying the motion, and the appeals were consolidated before the District Court. The District Court affirmed for substantially the same reasons expressed by the Bankruptcy Court, and stated that it had “considered all of appellants’ other arguments for reversal and [did] not find them persuasive.” See In re Duplan Corp., 229 B.R. 609, 611 (S.D.N.Y.1999).
II. DISCUSSION
Appellants assert that the Oil Companies’ claims against them as distributees of *151 the assets of Panex (formerly Duplan) were discharged in Duplan’s bankruptcy proceeding. They seek enforcement of the permanent injunction in the Final Decree issued in that proceeding. On appeal to this Court, appellants argue that: (1) the courts below erred in interpreting our decision in LTV Steel Co. v. Shalala (In re Chateaugay Corp.), 53 F.3d 478 (2d Cir.) (“Chateaugay II”), cert. denied, 516 U.S. 913, 116 S.Ct. 298, 133 L.Ed.2d 204 (1995), overruled on other grounds by Eastern Enterprises v. Apfel, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998), as mandating the conclusion that the Oil Companies’ CERCLA claims arose “post-petition”; (2) even if the CERCLA claims arose “post-petition,” they were discharged and enjoined by virtue of having arisen prior to the Final Decree; and (3) the courts below erred in not discharging and enjoining Texaco’s RCRA and common law claims of strict liability and equitable disgorgement.
A. Standard of Review
A district court’s order in a bankruptcy case is subject to plenary review, meaning that this Court undertakes an independent examination of the factual findings and legal conclusions of the bankruptcy court. The Bankruptcy Court’s findings of fact are reviewed for clear error and its conclusions of law are reviewed de novo. See In re Colony Hill Assoc., 111 F.3d 269, 273 (2d Cir.1997). The Bankruptcy Court’s interpretation of the text of the Plan, the Confirmation Order, and the Final Decree are conclusions of law reviewed de novo. See Bellefonte Reins. Co. v. Aetna Cas. and Sur. Co., 903 F.2d 910, 912 (2d Cir.1990) (“The proper standard for appellate review of a pure textual construction by the district court, whatever the procedural posture of the case, is de novo.”).
B. The Oil Companies’ CERCLA Claims Arose Post-Petition
The lower courts correctly found, and the parties do not appear to dispute, that if the Oil Companies’ CERCLA claims arose before the filing of the petition on August 31, 1976, the claims were discharged in Duplan’s bankruptcy proceeding. Appellants contend, however, that the lower courts incorrectly concluded that the claims arose post-petition. We disagree.
A claim arises for purposes of bankruptcy when “the relationship between the debtor and the creditor contained all of the elements necessary to give rise to a legal obligation ... under the relevant non-bankruptcy law.” Chateaugay II, 53 F.3d at 497 (quoting In re Nat’l Gypsum Co., 139 B.R. 397, 405 (N.D.Tex.1992)).[8]
Both courts below correctly held that under Chateaugay II, CERCLA claims arise for purposes of bankruptcy at the earliest on the date that CERCLA became effective, December 11, 1980. In Chateaugay II, this Court held that claims against the bankrupt debtor under the Coal Act for contribution to a health and benefit fund for retired coal miners (the “Fund”), were not discharged as pre-petition claims because the claims “arose” upon the enactment of the Coal Act, which (like CERCLA in this case) was enacted after the petition was filed but before confirmation of the plan.
The Court first noted that:
the existence of a valid bankruptcy claim depends on (1) whether the claimant possessed a right to payment, and (2) whether that right arose before the filing of the petition.
*152 A claim will be deemed pre-petition when it arises out of a relationship recognized in, for example the law of contracts or torts. A claim exists only if before the filing of the bankruptcy petition, the relationship between the debtor and the creditor contained all of the elements necessary to give rise to a legal obligation ... under the relevant non-bankruptcy law.
Id. at 497 (internal quotations omitted). In determining whether the claim existed pre-petition, the Court analyzed the relationship of the parties and found that the obligations under the Coal Act were exclusively statutory in origin, newly imposed, and could not be considered payment for pre-petition labor or a revival of old contractual obligations. See id. After noting that the claims “simply did not exist” before the enactment of the Coal Act, the Court held:
“[W]here there is no legal relationship defined at the time of petition,” that is, where the statute imposing the liability has not been enacted, “it would be impossible to find even the remotest ‘right to payment.’ ” Therefore, LTV’s Coal Act obligations do not represent pre-petition claims that must be disallowed as untimely.
Id. (quoting In re Chateaugay Corp., 154 B.R. 416, 419 (S.D.N.Y.1993)) (internal citations omitted).
As the District Court observed, “[t]here is nothing in Chateaugay II that indicates that its principle should not be applied in the environmental context.” In re Duplan, 229 B.R. 609, 610 (S.D.N.Y.1999). In fact, the Chateaugay II court relied, in part, on Matter of Penn Central Transportation Co., 944 F.2d 164 (3d Cir.1991), a case under the Act holding that “a cleanup claim under CERCLA could [not] exist prior to the enactment of the statute, even though the claim admittedly was based on pre-petition activities.” Chateaugay II, 53 F.3d at 497 (discussing Penn Central, 944 F.2d at 167-68). In Penn Central, the release or threatened release of hazardous substances by the debtor occurred before and during the bankruptcy proceeding, but CERCLA was not enacted until after the consummation date. The Penn Central court held that:
it was not until the passage of CERCLA that a legal relationship was created between the petitioners and [the debtor] relevant to the petitioners’ potential causes of action such that an interest could flow....
Here, because CERCLA had not yet been enacted, the petitioners lacked this cause of action against [the debtor] prior to the Consummation Date.
944 F.2d at 168.
Moreover, CERCLA, like the Coal Act, created new and unique obligations arising out of previous conduct. Just as the Coal Act did not codify existing obligations arising out of the pre-petition labor of former coal miners, see Chateaugay II, 53 F.3d at 497 (“[T]he existence of a prior contractual liability for retiree health benefits ... does not render pre-petition the later statutory imposition of retiree health care obligations by Congress.”) (citation omitted), CERCLA did not codify existing liability for property damage, contribution and restitution, see Bedford Affiliates v. Sills, 156 F.3d 416, 427 (2d Cir.1998) (“In enacting ... a statutory right of contribution[,] Congress created a statutory settlement scheme. The scheme was put in place to aid the expeditious resolution of environmental claims.... [Instituting common law restitution and indemnification actions in state court would bypass this carefully crafted settlement system.”); Ohio v. United States Dep’t of the Interior, 880 F.2d 432, 459-61 (D.C.Cir.1989) (concluding that CERCLA does not cover damages to private property). Rather, CERCLA created a new scheme of liability geared toward cleaning-up contaminated property as quickly as possible. See Bedford Affiliates, 156 F.3d at 423 (“Potentially responsible persons are held strictly liable for, among others, necessary cleanup costs ‘incurred by any other per *153 son consistent with the national contingency plan.’ ”) (quoting CERCLA § 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B)); CMC Heartland Partners v. Union Pac. R.R. (Matter of Chicago, Milwaukee, St. Paul & Pac. R.R.), 3 F.3d 200, 201 (7th Cir.1993) (“[CERCLA] ... seek[s] to protect public health and the environment by facilitating the cleanup of environmental contamination and imposing costs on the parties responsible for the pollution.”). Claims under CERCLA “simply did not exist” before CERCLA’s enactment on December 11, 1980. See Chateaugay II, 53 F.3d at 497.[9]
Duplan filed its petition on August 31, 1976, and the Oil Companies’ CERCLA claims against Duplan arose at the earliest on December 11, 1980. The Oil Companies’ CERCLA claims therefore arose post-petition.
C. The Oil Companies’ CERCLA claims Were Not Discharged In Duplan’s Bankruptcy Proceeding
Appellants also assert that even if we conclude, as we have, that the CERCLA claims arose post-petition, the claims were discharged by virtue of having arisen prior to the issuance of the Final Decree. We disagree with this assertion as well.
Under the Act, the drafters of a plan of reorganization were required to include certain provisions, but were otherwise left to their own discretion in including “any other appropriate provisions not inconsistent with the provisions of this chapter.” 11 U.S.C. § 616(14). If the plan included all of the required provisions; was fair, equitable, and feasible; and did not include provisions inconsistent with Chapter X, the judge was required to confirm the plan. See 11 U.S.C. § 621. Upon confirmation of a plan,
the plan and its provisions shall be binding upon the debtor, upon every other corporation issuing securities or acquiring property under the plan, and upon all creditors and stockholders, whether or not such creditors and stockholders are affected by the plan or have accepted it or have filed proofs of their claims or interest and whether or not their claims or interests have been scheduled or allowed or are allowable.
11 U.S.C. § 624(1). When transferred, the property dealt with in the plan “shall be free and clear of all claims and interests of the debtor, creditors, and stockholders, except such claims and interests as may otherwise be provided for in the plan or in the order confirming the plan ....” 11 U.S.C. § 626 (emphasis added).
Upon consummation of the plan, the judge was required to enter a final decree:
(1) discharging the debtor from all its debts and liabilities and terminating all rights and interests of stockholders of the debtor, except as provided in the plan or in the order confirming the plan
(2) discharging the trustee, if any;
(3)- making such provisions by way of injunction or otherwise as may be equitable; and
(4) closing the estate.
*154 11 U.S.C. § 628 (emphasis added). Unless the plan or confirmation order provided otherwise, a final decree discharged the debtor from all rights and interest of creditors, “including liabilities incurred during reorganization” and “claims or interests not filed or scheduled in the case.” James W. Moore, et al., 6A Collier on Bankruptcy ¶ 11.18 (14th ed.1977). In this case, the Discharge in the Final Decree states that it is subject to the provisions in the Plan and Confirmation Order; the Permanent Injunction in the Final Decree states that it is subject to specific exceptions in the Plan and Confirmation Order.
The Bankruptcy Court interpreted the Final Decree as discharging and enjoining only those claims that arose prior to the filing of the petition. It based this decision on two conclusions: (1) the definition of “Claim” in the Plan limited the scope of the Discharge in the Final Decree to claims arising prior to the filing of the petition, see In re Duplan, 209 B.R. at 331 (quoting the Plan at B-2); and (2) the Plan specifically excepted from discharge and permanent injunction all Administrative Claims, defined in relevant part as costs and expenses arising in the administration of the estate during the reorganization, see id. at 333. Although we reject the Bankruptcy Court’s first conclusion, we agree that claims that arose during the reorganization are Administrative Claims specifically excepted from discharge and permanent injunction.
The Bankruptcy Court erred in relying on the definition of “Claim” in the Plan to limit the Discharge in the Final Decree. The Discharge in the Final Decree terminated all of the debtors’ debts and liabilities except as provided in the Final Decree or in the Plan. The Final Decree itself made no exceptions. In fact, it does not even include the word claim or make any reference to the definition of a “Claim” in the Plan. The definition of “Claim” in the Plan merely describes the specific claims covered by the Plan as part of reorganizing the Debtors’ known liabilities and assets. Nothing in the definition suggests that it created a specific exception to the general discharge in the Final Decree; it simply was not meant to limit the scope of that Discharge.
Furthermore, the Bankruptcy Court’s interpretation of the effect of the Plan’s definition of “Claim” on the Discharge is “inconsistent with the provisions of [Chapter X].” 11 U.S.C. § 616(14). The Plan did partially define a “Claim” as any claim arising “prior to the filing” of the petition. In concluding that “the Discharge in the Final Decree only discharged claims that arose ‘prior to the filing’ of the Debtor’s petition,” In re Duplan, 209 B.R. at 331 (quoting the Plan at B-2), however, the Bankruptcy Court disregarded the remainder of the definition, which further required that a proof of claim be filed before the Bar Date and that the claim be allowed by the court. According to the Bankruptcy Court’s analysis of the Plan’s effect on the Discharge, the only claims that would have been discharged in the Final Decree were those (1) that arose prior to the filing of the petition, (2) for which a proof of claim was filed before the Bar Date, and (3) that the court ultimately allowed. In such a case, any creditor whose claim arose prior to the filing of the petition, but who did not bother to file a proof of claim, or who filed a proof of claim disallowed by the court, would avoid discharge of its claim. This interpretation directly undermines the statutorily required binding effect of the Plan and Final Decree on all creditors regardless of whether they accept the Plan, file proofs of their claims, or succeed in getting their claims scheduled or allowed. See 11 U.S.C. § 624(1). In addition, it contravenes Chapter X’s purpose of giving the reorganized corporation a fresh start. See Jezarian v. Raichle (Matter of Stirling Homex Corp.), 579 F.2d 206, 212 (2d Cir.1978) (“The word ‘claims’ as defined in § 106(1) is sweeping in scope ... and it should be given a broad construction with respect to claims and creditors in order to dispose of all liabilities of the debtor in *155 reorganization”) (quoting Collier on Bankruptcy ¶ 2.05).
Nonetheless, the Bankruptcy Court correctly interpreted the Final Decree and Plan to specifically except from discharge and permanent injunction all Administrative Claims. Any claim that arose during the reorganization, i.e., after the filing of the petition and before the reorganization was complete, in the ordinary course of Duplan’s (or Panex’s) business, is an Administrative Claim under the Plan. Any of the Oil Companies’ claims that arose during the reorganization arose out of Duplan’s prior and continuing business activities and is therefore an Administrative Claim under the Plan. See Reading Co. v. Brown, 391 U.S. 471, 485, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968) (post-petition tort claims are “actual and necessary costs” of administration under the Act); Pension Benefit Guar. Corp. v. Sunarhauserman, Inc. (In re Sunarhauserman, Inc.), 126 F.3d 811, 818 (6th Cir.1997) (claim arising post-petition is “entitled to administrative expense status”); United States v. LTV Corp. (In re Chateaugay Corp.) (“Chateaugay I”), 944 F.2d 997, 1009-1010 (2d Cir.1991) (“[Rjesponse costs for post-petition remedial action [to clean up pre-petition release of hazardous wastes] qualify as administrative expenses.”); In re Virginia Builders, Inc., 153 B.R. 729, 734 (Bankr. E.D.Va.1993) (post-petition conduct causing environmental damage “falls within the necessary costs of preserving the estate and ha[s] been afforded administrative expense priority.”).
According to the Plan, debts and liabilities associated with Administrative Claims were “expressly assumed” by Duplan/Pa-nex going forward and would be paid “in the ordinary course of business.” Plan at B-ll. The Final Decree excepted from discharge and permanent injunction “such liabilities and claims as such Debtors or said Reorganized Corporation have expressly assumed or agreed to pay pursuant to the Plan herein or the order confirming the Plan.” Final Decree at ¶7. Thus, if the Oil Companies’ claims arose during the reorganization, they are not discharged or enjoined by the Final Decree.
Assuming the Oil Companies’ CERCLA claims arose on the date of enactment,[10] they arose post-petition during the reorganization and therefore are Administrative Claims not discharged or enjoined by the Final Decree. We have considered appellants other arguments that the Oil Companies’ CERCLA claims were discharged in Duplan’s bankruptcy proceeding and find them to be without merit. We therefore affirm the District Court’s affirmance of the Bankruptcy Court’s denial of injunctive relief as to the CERCLA claims.
D. The Oil Companies Are Prohibited As A Matter Of Law From Bringing Their RCRA Claims
Neither the bankruptcy court nor the district court addressed whether the RCRA claims brought by the Oil Companies were discharged in Duplan’s bankruptcy proceeding. We need not address whether the claims were discharged either, because as a matter of law on this record, the Oil Companies are foreclosed from bringing their RCRA claims. The Oil Companies asserted RCRA claims under RCRA § 7002, 42 U.S.C. § 6972(a). Section 6972(a) provides for citizen suits to restrain PRPs from continuing to “present an imminent and substantial endangerment to health or the environment” and/or to clean up a site that “presents] an imminent and substantial endangerment to health or the environment.” 42 U.S.C. § 6972(a)(1)(B). Esso sought the former and Texaco sought the latter. Section *156 6972(b)(2)(B), however, .specifically provides that neither type of these citizen suits may be brought:
if the [EPA], in order to restrain or abate acts or conditions which may have contributed or are contributing to the activities which may present the alleged endangerment
(iv) has ... issued an administrative order under section 106 of [CERLCA] or section 6973 of this title pursuant to which a responsible party is diligently conducting a removal action, Remedial Investigation and Feasibility Study (RIFS), or proceeding with a remedial action.
42 U.S.C. § 6972(b)(2)(B).
The Oil Companies assert in their complaints all of the facts necessary to find that § 6972(b)(2)(B)(iv) on its face prohibits them from bringing suit. In fact, their own acts prohibit them from bringing suit. Esso’s operative complaint states:
43. On March 22,1990, the EPA issued a Unilateral Administrative Order (“UAO”) to Esso and others under the provisions of RCRA and CERCLA requiring, inter alia, the implementation of a well monitoring program at the Tutu Wells Site. Esso has implemented and fulfilled the requirements of the UAO in a manner consistent with the National Contingency Plan (“NCP”).
44. In February 1992, the EPA entered an Administrative Order of Consent (“ACO”) with Esso and others, under ■ the provisions of RCRA and CERCLA requiring, among other things, that Esso undertake a Remedial Investigation/Feasibility Study (“RI/FS”) for the Tutu Wells Site. Esso has implemented and fulfilled the requirements' of the ACO in a manner consistent with the NCP.
Esso Complaint at ¶¶ 42-43. Texaco’s operative complaint'similarly states:
37. In March 1990, pursuant to RCRA and CERCLA, the EPA ordered, inter alia, - Texaco and others to institute a monitoring program at the Tutu Well-field Site. Texaco has implemented and fulfilled the requirements of this order.
38. In February, 1992 Texaco and others entered into an Administrative Order of Consent (“AOC”) with the EPA. Under this Order, Texaco agreed to perform a Remedial Investigation and Feasibility Study (“RI/FS”) to determine the extent and sources of Chlorinated VOC’s and hydrocarbon contamination of the Tutu Wellfield Site. Texaco has implemented and fulfilled the requirements of the AOC.
Texaco Complaint ¶¶ 37-38.
Thus, as a matter of law the Oil Companies were foreclosed from bringing their RCRA claims in the first instance and remain foreclosed from asserting them. The Virgin Islands District Court has already dismissed the Oil Companies’ RCRA claims for this very reason. See In re Tutu Wells Contamination Litig., 994 F.Supp. at 659. In light of our conclusion that the Oh Companies are barred by their own assertions from bringing these RCRA claims, there is no need for injunctive relief and the lower courts’ denial of injunctive relief is affirmed.
E. The Common Law Claims
Neither of the courts below addressed Texaco’s common law claims for strict liability and equitable disgorgement, despite appellants’ assertion that the common law claims were also discharged in Duplan’s bankruptcy proceeding. The Bankruptcy Court simply denied the entire motion without mentioning the non-CERCLA claims and without taking any evidence relevant to the determination of when the common law claims arose. The District Court affirmed without discussing the nonCERCLA claims. A common law basis for claims of strict liability and equitable disgorgement, however, existed long before the petition was filed and thus are not covered by the lower courts’ analyses of *157 the CERCLA claims. The issue here is whether the particular common law claims asserted by the Oil Companies arose pre- or post-petition.
A common law claim for damages to property from contamination arises when “[a]ll of the physical events required to establish the elements of ... such claims occurred.” Texaco, Inc. v. Sanders (In re Texaco, Inc.), 182 B.R. 937, 951 (Bankr.S.D.N.Y.1995) (discussing when claims for damage to property caused by contamination arise). This depends on whether there has been a release or threatened release of hazardous substances, whether that release has caused injury in the form of contamination, and whether the contamination is capable of detection. See id. at 951-52 (relying on Chateaugay II). These matters are disputed in this case, and thus require the bankruptcy court to make findings of fact.
The Bankruptcy Court in this case did not make the necessary findings of fact. During the hearing on Goldman’s motion, the Bankruptcy Court refused to take proffered evidence of when releases or threatened releases occurred at the Laga Facility and the Oil Companies’ facilities, when PCE’s reached the Tutu Site, and when the contamination became susceptible of discovery. These disputed material facts preclude this Court from determining when the Oil Companies’ common law claims arose and therefore, whether they are discharged. Accordingly, we vacate the District Court’s affirmance of the Bankruptcy Court’s denial of relief and remand for further proceedings.
III. CONCLUSION
For the foregoing reasons, we affirm the District Court insofar as it held that the Oil Companies’ CERCLA claims were not discharged in Duplan’s bankruptcy proceeding, and denied the motion to enforce the permanent injunction in the Final Decree as to those claims. We affirm the denial of relief on the RCRA claims for the reasons stated herein. We vacate the denial of relief on the Oil Companies’ common law claims and remand for further proceedings consistent with this opinion. Each party shall bear its own costs.

. On June 9, 1999, this Court granted the unopposed motion to substitute Norman Hal-per and Oliver Lazare as coexecutors of the Estate of Paul Lazare. Paul Lazare and his Estate will be referred to as "Lazare.”

. This case is governed by the Act rather than the Bankruptcy Code, because Duplan filed its bankruptcy petition on August 31, 1976. See Bankruptcy Reform Act of 1978, Pub.L. No. 95-598 § 403(a), 92 Slat. 2549, 2683 (providing that prior law and procedures apply to cases initiated before the effective date of the Bankruptcy Code, October 1, 1979). Unless otherwise noted, all references to Title 11 of the United States Code are references to the Act.

. The Confirmation Order states in pertinent part:
In order to implement the Plan, all creditors and stockholders of Duplan and all other persons, firms, corporations and other entities be, and they hereby are, permanently enjoined and restrained from asserting, in any manner, any claims against [Panex] or [Panex's] properties and from commencing or continuing any court -or other proceeding against [Panex] or [Pa-nex's] properties based on any Claim. Confirmation Order at ¶ O.

. The Discharge provided:
The Duplan Corporation (now known as Panex Industries, Inc.), and Duplan Fabrics, Inc., debtors (the ''Debtors”) be and they hereby are discharged from all of their debts and liabilities, and all rights and interests of creditors of the Debtors and of stockholders of the Reorganized Corporation be and they hereby are terminated, except as provided herein or in the Plan.
Final Decree at ¶ 2, as amended by Order dated December 16, 1983.

.The Permanent Injunction provided:
All creditors of, claimants against and stockholders of the Debtors, and all persons *149 having or claiming interests of any nature whatsoever in the property and assets of the Debtors, wheresoever situated or domiciled, be and they hereby are perpetually restrained and enjoined from pursuing or attempting to pursue, or from commencing any suits or other proceedings at law, in equity or otherwise, against the Debtors and/or the Reorganized Corporation, or their property, or of the property or assets transferred by the Debtors to the Reorganized Corporation, or against any nominee, assignee or grantee of the Debtors or the Reorganized Corporation, or against any person(s), corporation(s) or other entity(ies) claiming by, through or under the Debtors, directly or indirectly on account of or based upon any right, claim or interest which any such creditor, claimant, stockholder or other person may have had in, to or against said Debtors and/or against their property and assets, excepting only such liabilities and claims as such Debtors or said Reorganized Corporation have expressly assumed or agreed to pay pursuant to the Plan herein or the order confirming the Plan.
Final Decree at ¶ 7.

. After the Bankruptcy Court issued its decision in this case, the Delaware Chancery Court created a successor trust and appointed Michael deBaecke as Successor Trustee. The successor Panex Trust still exists.

. CERCLA preempts the restitution and contribution claims. See Bedford Affiliates v. Sills, 156 F.3d 416, 427 (2d Cir.1998). In 1998, the Virgin Islands District Court granted a motion to dismiss voluntarily and without prejudice the Oil Companies’ claims against Goldman Sachs and the First'Manhattan Appellants for lack of personal jurisdiction. See In re Tutu Wells Contamination Litig., 994 F.Supp. 638, 655 (D.V.I.1998). The Oil Companies remain free to reassert these claims in any district court that has personal jurisdiction. The Virgin Islands District Court also dismissed the Oil Companies’ RCRA claims against the other appellants for failure to state a claim because section 6972(b)(2)(B)(iv) specifically prohibited the Oil Companies from bringing the claims. See id. at 659-60. It did not dismiss the CERCLA claims or the common law claims for strict liability and equitable disgorgement. See id. at 678. The Virgin Island District Court’s decision remains subject to appeal.

. Chateaugay II arose under the Bankruptcy Code, not the Act. Case law under the Act regarding when a claim arises is sparse. Case law under the Bankruptcy Code, however, is persuasive because the definition of claim under the Code is similar to the definition of claim under the Act to the extent that both ''require[] a legal ‘right’ to be in existence at the time of the filing.” Chateaugay II, 53 F.3d at 497.

. We note that this Court’s recent decision in Olin Corp. v. Riverwood Int’l Corp. (In re Manville Forest Products Corp.), 209 F.3d 125 (2d Cir.2000), is not to the contrary. In Olin, the parties signed a pre-petition indemnification agreement whereby the debtor agreed to indemnify Olin for liabilities later incurred. See id. at 126-27. After confirmation of the Plan, a statute was enacted creating liability on the part of Olin for the clean-up of contaminated property. Olin thereafter requested indemnification from the debtor pursuant to the indemnification agreement. See id. at 126-27. The Court held that Olin's claims under the indemnification agreement arose pre-petition because "Olin brought a contract cause of action based on a pre-petition contract, not a statutory claim for indemnification under a statute enacted [after] confirmation.” Id. at 130. The Court specifically distinguished "cases which held that a claim flowing directly from a statute enacted post-petition is not discharged by confirmation even if based upon pre-petition acts.” Id. at 129-30 (citing, inter alia, Chateaugay II, 53 F.3d at 497).

. We are assuming that these CERCLA claims arose on the date of enactment only for purposes of determining whether claims arising during the reorganization, in addition to those claims arising pre-petition, were discharged in Duplan’s bankruptcy proceeding. Nothing in this opinion precludes a finding that these CERCLA claims actually arose after the date of enactment and after the close of Duplan's bankruptcy proceeding.