22-2891-bk

# In the
# United States Court of Appeals
# For the Second Circuit

―――――――

August Term 2023
No. 22-2891-bk

IN RE: WINDSTREAM HOLDINGS, INC.,
*Debtor.*

―――――――

WINDSTREAM HOLDINGS, INC.,
*Debtor-Plaintiff-Appellant,*

OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF WINDSTREAM HOLDINGS, INC.,
*Plaintiff,*

v.

CHARTER COMMUNICATIONS OPERATING, LLC, CHARTER COMMUNICATIONS INC.,
*Defendants-Appellees.*

―――――――

ARGUED: SEPTEMBER 7, 2023
DECIDED: JUNE 24, 2024

―――――――

Before: LIVINGSTON, *Chief Judge,* CABRANES, and KAHN, *Circuit Judges.*

―――――――

Plaintiff-Appellant Windstream Holdings, Inc. ("Windstream") appeals from the judgment of the United States District Court for the Southern District of New York (Cathy Seibel, *J.*), vacating in part the decision of the United States

Bankruptcy Court for the Southern District of New York (Robert D. Drain, *J.*). In its opinion, the district court held that there was a fair ground of doubt as to whether advertisements by Charter Communications Inc. and Charter Communications Operating, LLC (together, "Charter") violated the automatic stay attendant to the filing of the bankruptcy action. Accordingly, the district court refrained from holding Charter in civil contempt pursuant to *Taggart v. Lorenzen*, 587 U.S. 554 (2019). In so holding, the district court found that Charter did not attempt to exercise control over any property of Windstream's bankruptcy estate through its advertisements in violation of 11 U.S.C. § 362(a)(3). On appeal, Windstream argues that Charter attempted to exercise control over its customer contracts and goodwill. We conclude that there is a fair ground of doubt as to whether Charter's actions violated the automatic stay and, accordingly, hold that the district court did not err by refraining from holding Charter in civil contempt.

We therefore **AFFIRM** the judgment of the district court.

————————————

TERENCE P. ROSS, Katten Muchin Rosenman LLP, Washington, D.C. (Robert T. Smith, Katten Muchin Rosenman LLP, Washington, D.C.; Shaya Rochester, Katten Muchin Rosenman LLP, New York, NY, *on the brief*), *for Debtor-Plaintiff-Appellant*.

DAVID M. COOPER (Susheel Kirpalani, Benjamin I. Finestone, *on the brief)*, Quinn Emanuel Urquhart & Sullivan, LLP, New York, NY, *for Defendants-Appellees*.

————————————

MARIA ARAÚJO KAHN, *Circuit Judge*:

When a company files for bankruptcy, competitors could see it as an opportunity to target the bankrupt organization's customers through competitive advertising. Such competitive action, however, may run afoul of the automatic

stay that takes effect upon the filing of a bankruptcy petition. Plaintiff-Appellant Windstream Holdings, Inc. ("Windstream") brought this action against Defendants-Appellees Charter Communications Inc. and Charter Communications Operating, LLC (together, "Charter"), alleging that Charter's advertising campaign during Windstream's bankruptcy was an attempt to exercise control over Windstream's customer contracts and goodwill, and therefore a violation of the automatic stay. The United States Bankruptcy Court for the Southern District of New York (Robert D. Drain, *J.*) agreed with Windstream, held Charter in civil contempt for its actions, and imposed sanctions against Charter. The United States District Court for the Southern District of New York (Cathy Seibel, *J.*) reversed the bankruptcy court's decision, finding that a fair ground of doubt existed as to whether Charter violated the automatic stay. As explained below, we conclude that such doubt exists, and we therefore affirm the judgment of the district court.

## BACKGROUND

Windstream and Charter are competing telecommunications providers. On February 25, 2019, Windstream filed for Chapter 11 reorganization and, pursuant

to 11 U.S.C. § 362,[1] the automatic stay went into effect on that date. Windstream alleges that within one week of filing its Chapter 11 petition, it secured $1 billion in debtor-in-possession financing which allowed it to continue operating in the ordinary course through the entirety of its Chapter 11 proceedings.

Shortly after Windstream filed its Chapter 11 petition in March 2019, Charter launched a direct-mail advertising campaign targeting Windstream customers. The initial mailing was sent in an envelope displaying colors similar to Windstream's signature color pattern with the words "Important Information Enclosed for Windstream Customers" prominently displayed in a bold font similar to the font used on Windstream's website and customer communications. *See* J. App'x at 1742–43. Charter did not include its own name in the return address on the envelope. Inside the envelope was a two-sided advertisement for Charter's residential internet brand, Spectrum. The front-page of the advertisement displayed the logo for Spectrum above the words "Windstream Customers, Don't Risk Losing Your Internet and TV Services." *Id*. at 1721. Below that, the advertisement contained the following text:

> Windstream has filed for Chapter 11 bankruptcy, which means uncertainty. Will they be able to provide the Internet

---

[1] The Bankruptcy Code is found at Title 11 of the United States Code. Unless otherwise stated, statutory references are to the Bankruptcy Code.

and TV services you rely on in the future?  To ensure you are not left without vital Internet and TV services, switch to Spectrum. . . .   Windstream has a 2-year contract.  With Spectrum there are no contracts.  Plus, we will buy you out of your current contract up to $500 . . . . Goodbye, Windstream. Hello, Spectrum.

*Id*. at 1721 (emphasis omitted).  The back of the advertisement stated, also under Spectrum's logo, that "Windstream's future is unknown, but Spectrum is here to stay . . . ."  *Id*. at 1722.

Charter mailed the advertisements to approximately 800,000 residences in geographic markets that it determined, through publicly available information, were likely to include Windstream customers.  Windstream alleged that Charter's advertisements created confusion among its customers, causing Windstream to lose approximately 1,386 customers.  Windstream further alleged that it had to spend over $860,000 to offer credits and discounts to retain its existing customers, launch a corrective advertising campaign, and later propagate a promotional campaign to mitigate the impact of Charter's advertisements and the resulting service disruptions.

On April 5, 2019, Windstream filed an adversary proceeding (the "Adversary Proceeding") against Charter in the bankruptcy court alleging seven

claims.[2] As relevant here, Windstream alleged that Charter's direct mail campaign violated the automatic stay because Charter's allegedly false advertisements harmed Windstream's goodwill which, according to Windstream, constituted an act to exercise control over the property of Windstream's estate.[3] On the same day it filed its Adversary Proceeding, Windstream moved for a temporary restraining order and preliminary injunction seeking to enjoin Charter's direct mail campaign. On April 16, 2019, the bankruptcy court issued a temporary restraining order, ordering Charter to "cease and desist" its direct mail campaign. *Id*. at 490. A month later, the bankruptcy court issued a preliminary injunction to the same effect.

---

[2] The specific claims are as follows: (I) violation of the Lanham Act; (II) violation of the Georgia Uniform Deceptive Trade Practices Act; (III) violation of the North Carolina Unfair and Deceptive Trade Practices Act; (IV) violation of the Nebraska Uniform and Deceptive Trade Practices Act; (V) breach of written contract; (VI) violation of the automatic stay; and (VII) equitable subordination. On October 9, 2019, Charter filed a motion with the district court to withdraw the reference from the bankruptcy court as to Counts I through V. On April 21, 2020, the district court withdrew the reference as to those claims so they could be adjudicated before the district court. Those proceedings are currently stayed pending resolution of this appeal.

[3] Around the same time as it was sending out its advertisements, Charter cut off service to approximately 350 Windstream subscribers. Windstream and Charter have a "last mile" connectivity service agreement pursuant to which Windstream has the right to use Charter's infrastructure to distribute Windstream services to subscribers in certain designated areas. Windstream alleged that Charter violated the automatic stay by interfering with Windstream's contractual rights by failing to provide service to Windstream's customers. The bankruptcy court agreed and awarded Windstream $5,278.85 on that claim. Charter did not contest that award, and this issue is not on appeal.

On November 15, 2019, Charter and Windstream each filed motions for summary judgment in the bankruptcy court. On December 18, 2019, the bankruptcy court held a hearing on the parties' summary judgment motions. As relevant here, the bankruptcy court issued a bench ruling that same afternoon, denying Charter's summary judgment motion and granting in part and denying in part Windstream's motion for summary judgment on Counts VI and VII.[4] The bankruptcy court held that Charter violated the automatic stay by disseminating its "literally false and misleading advertising in an effort to control property of [Windstream's] estate, namely, [Windstream's] customers or contracts with those customers." S. App'x at 7. Specifically, the bankruptcy court held that Charter "intentionally design[ed] the false mailer to look like it was sent by [Windstream]," *id.* at 5, and "falsely communicat[ed] in the mailer that [Windstream's] service was at imminent risk of being terminated," *id.* at 6. The bankruptcy court reserved decision on damages, noting that disputed facts remained as to whether Charter's actions would satisfy the standard for civil contempt.

---

[4] Although the bankruptcy court granted Windstream's motion for summary judgment on Counts I through V as to liability, as referenced in Footnote 3, the district court granted Charter's motion to withdraw the reference to those claims, and they remain with the district court.

In May 2020, the bankruptcy court held a four-day trial on Counts VI and VII to determine, *inter alia*, whether Charter should be held in contempt for violating the automatic stay and sanctioned accordingly. On April 8, 2021, the bankruptcy court issued a memorandum of decision holding Charter in contempt for violating the automatic stay through its "false and intentionally misleading advertising campaign that wrongfully interfered with [Windstream's] customer contracts and goodwill." *In re Windstream Holdings, Inc. ("Windstream I")*, 627 B.R. 32, 37–38 (Bankr. S.D.N.Y. 2021). In so holding, the bankruptcy court noted that "[a]lthough every corporation expects legitimate advertising by competitors, . . . improper advertising such as [Charter's] clearly and objectively interfered with [Windstream's] customer contracts and goodwill." *Id*. at 47. The bankruptcy court sanctioned Charter $19,179,329.45 for the losses caused by its advertisements and entered judgment in favor of Windstream on April 13, 2021. Thereafter, Charter filed a notice of appeal in the district court.

On October 6, 2022, the district court found that the bankruptcy court erred in concluding that Charter's advertising campaign constituted "an act to exercise control" over Windstream's property and that Charter should be held in contempt for that conduct. *See In re Windstream Holdings, Inc. ("Windstream II")*, 634 F. Supp.

3d 99 (S.D.N.Y. 2022). Specifically, the district court held that even if there was sufficient evidence that Windstream had contracts with its customers and goodwill that could be considered property of the bankruptcy estate, Charter's conduct in soliciting Windstream's customers did not amount to an exercise of control over such property in violation of the automatic stay. *Id*. at 108–09. The court further concluded that the bankruptcy court had exceeded its discretion in issuing a contempt order under § 105(a) because there was a "fair ground of doubt" as to whether customer solicitation violates the automatic stay. *Id*. at 114; *see Taggart v. Lorenzen*, 587 U.S. 554, 557 (2019). Windstream appealed the district court's judgment.

## DISCUSSION

"A district court's order in a bankruptcy case is subject to plenary review, meaning that this Court undertakes an independent examination of the factual findings and legal conclusions of the bankruptcy court." *In re Markus*, 78 F.4th 554, 562–63 (2d Cir. 2023) (quoting *In re Duplan Corp.*, 212 F.3d 144, 151 (2d Cir. 2000)). "The bankruptcy court's findings of fact are reviewed for clear error, and its conclusions of law are reviewed *de novo*. By contrast, a bankruptcy court's award

of sanctions is reviewed for abuse of discretion." *Id.* at 563 (internal citation omitted).

## I.  DOES THE *TAGGART* STANDARD APPLY?

This Court has held that the broad administrative power afforded to the bankruptcy courts by § 105(a),[5] rather than § 362(k),[6] is the bankruptcy court's source of authority for sanctioning those who willfully violate the automatic stay of the estates of corporate debtors. *See In re Chateaugay Corp.*, 920 F.2d 183, 186–87 (2d Cir. 1990) ("[A] bankruptcy court may impose sanctions pursuant to § 362(h) . . . only for violating a stay as to debtors who are natural persons. For other debtors, contempt proceedings are the proper means for willful violations of the automatic stay.").

---

[5] We have observed that "§ 105 is an omnibus provision phrased in such general terms as to be the basis for a broad exercise of power in the administration of a bankruptcy case." *In re Casse*, 198 F.3d 327, 336 (2d Cir. 1999) (internal quotation marks and citation omitted). We have also said that § 105(a) "confer[s] authority to fill the gaps left by the statutory language and to exercise equity in carrying out the *provisions* of the Bankruptcy Code." *In re Greenwich Sentry, L.P.*, 534 F. App'x 77, 80 (2d Cir. 2013) (summary order) (internal quotation marks and citations omitted).

[6] Section 362(k), formerly 362(h), provides that "an individual injured by any willful violation of a stay provided by [§ 362] shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362 (k)(1); *see also Garfield v. Ocwen Loan Servicing, LLC*, 811 F.3d 86, 91 (2d Cir. 2016) (noting the change from § 362(h) to § 362(k)).

In the context of a violation of a debtor's discharge injunction, the Supreme Court clarified the standard to be applied in determining whether a party may be held in civil contempt under § 105(a). *See Taggart*, 587 U.S. at 559–60. The Court determined that a bankruptcy court may hold a party in civil contempt for violating the discharge injunction "if there is *no fair ground of doubt* as to whether the order barred the [party's] conduct." *Id*. at 557. The *Taggart* standard of "no fair ground of doubt" is satisfied "when there is no objectively reasonable basis for concluding that the [party's] conduct might be lawful under the discharge order." *Id*. at 560. Since this case involves a civil contempt order under § 105(a) for a violation of an automatic stay, rather than a violation of a discharge injunction, an open question remains as to whether the same standard also applies to stay violation contempt proceedings.[7]

To be sure, the Supreme Court in *Taggart* distinguished § 362(k)(1), the provision of the Bankruptcy Code that addresses remedies for violation of the automatic stay, and § 105(a). *See id*. at 565 ("The purposes of automatic stays and

---

[7] Although Windstream argued for the application of a more debtor-friendly standard before the district court, *see Windstream II*, 634 F. Supp 3d at 113, on appeal, the parties do not dispute that *Taggart's* standard also applies to sanctions imposed for violations of the automatic stay. Indeed, both the bankruptcy court (*see Windstream I*, 627 B.R. at 40) and the district court (*see Windstream II*, 634 F. Supp. 3d at 113–14) applied *Taggart's* "no fair ground of doubt" standard.

discharge orders . . . differ: A stay aims to prevent damaging disruptions to the administration of a bankruptcy case in the short run, whereas a discharge is entered at the end of the case and seeks to bind creditors over a much longer period."). Nevertheless, this distinction matters little in the case of entities that are subject to sanctions for violations of the automatic stay under § 105(a), rather than § 362(k)(1). *See In re Chateaugay*, 920 F.2d at 186–87. As the Court noted, the *Taggart* standard "reflects the fact that civil contempt is a severe remedy, and that principles of basic fairness requir[e] that those enjoined receive explicit notice of what conduct is outlawed before being held in civil contempt." *Taggart*, 587 U.S. at 561 (citations and internal quotation marks omitted). In light of these "traditional principles that govern civil contempt," *id*. at 565, we see no reason why *Taggart's* objective standard should not apply equally to a civil contempt action for violation of the automatic stay provision. We therefore apply *Taggart's* standard to § 105 contempt actions that are not covered by § 362(k).

## II.    WAS THERE A "FAIR GROUND OF DOUBT"?

Having found that *Taggart's* "no fair ground of doubt" standard applies to the case at hand, we now turn to whether such a doubt existed to determine whether civil contempt sanctions were appropriate. Windstream argues that there

is "no fair ground of doubt" that Charter violated the automatic stay by exercising control over two areas of its property—customer contracts and goodwill.  On the other hand, Charter argues that neither Windstream's customer contracts nor its goodwill were properly considered property of the bankruptcy estate in this case and that, even if they were, Charter's advertising campaign did not "exercise control" over those assets or violate the automatic stay.  We address each argument in turn.

### A. Are Windstream's Customer Contracts and Goodwill "estate property"?

The automatic stay provisions under § 362(a) are designed to "protect[ ] bankruptcy estates by restraining any formal or informal action or legal proceeding that might dissipate estate assets or interfere with the trustee's orderly administration of the estate." *In re Fogarty*, 39 F.4th 62, 71 (2d Cir. 2022) (quoting *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 207 (2d Cir. 2014)).  Section 362(a) operates as a stay against actions that interfere with a debtor's estate, including "any act to obtain possession of" or "to exercise control over property of the [debtor's] estate."  § 362(a)(3).  Section 541(a)(1) defines "property of the estate" as "all legal or equitable interests of the debtor in property as of the commencement of the [bankruptcy] case."

13

We have held that contract rights are property of the estate, and that therefore those rights are protected by the automatic stay. *See In re AMR Corp.*, 730 F.3d 88, 102–03 (2d Cir. 2013) (finding that "an effort to affect [the debtor's] contract rights" once the automatic stay is in effect also affects "the property of the estate"); *Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008) ("Contractual rights clearly fall within the reach of [§ 541(a)(1)].").  Executory contracts, accounts receivable, and contractual arrangements that produce assured sales or income and are vital to the debtor's business have all been recognized as estate property.  *See In re Alert Holdings, Inc. ("Alert")*, 148 B.R. 194, 203 (Bankr. S.D.N.Y. 1992) ("Just as executory contracts are property of the estate, so, too, are accounts receivable [and] rights of action to recover accounts receivable . . . ."); *In re Golden Distribs., Ltd. ("Golden")*, 122 B.R. 15, 20 (Bankr. S.D.N.Y. 1990) (describing business arrangements that "can be translated into assured sales or income" and are "essential to the survival of the debtor" as "property of the estate").  Further, we have defined executory contracts as agreements in "which performance remains due to some extent on both sides." *In re Ionosphere Clubs, Inc.*, 85 F.3d 992, 998–99 (2d Cir. 1996) (quoting *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 522 n.6 (1984)).

As the district court noted, "[t]he record [in this case] is underdeveloped as to the specifics of the agreements Windstream had with its customers." *Windstream II*, 634 F. Supp. 3d at 106. Despite the lack of customer contracts in the record, we agree with the district court "that Windstream had some kind of contracts under which it provided services to at least some customers." *Id.* at 107. Specifically, customer call records that are part of the record demonstrate that Windstream's subscribers had ongoing, unperformed obligations to pay off their Windstream account balance periodically or risk service interruption. Moreover, customers' payment obligations were recurring. The record thus evidences an ongoing obligation on Windstream's part to provide service and an obligation on the part of its subscribers to pay for such service that is characteristic of executory contracts. Charter itself, in its advertisements, noted that "Windstream has a 2-year contract," suggesting that some kind of contractual obligation exists between Windstream and its customers. J. App'x at 1721. We therefore conclude that Windstream's customer contracts, in whatever form they exist, are property of the estate.

As for Windstream's goodwill, courts in this Circuit have long recognized that a debtor's goodwill can be properly categorized as property of the estate,

protected by the automatic stay. *See Mut. Life Ins. Co. v. Menin*, 115 F.2d 975, 977

(2d Cir. 1940) (Hand, J.) ("There can be no question of the power of the court to

sell the 'good-will' of the bankrupt along with its other assets."); *McKay v. Mad*

*Murphy's, Inc.*, 899 F. Supp. 872, 878 (D. Conn. 1995) (noting that "[a] trustee in

bankruptcy has the power to sell the trademarks and accompanying [goodwill] of

the bankrupt" (internal citation omitted)); *see also Alert*, 148 B.R. at 203 ("Just as

executory contracts are property of the estate, so, too, are . . . intangibles such as

customer lists and goodwill.").

Charter argues that goodwill "is rarely accepted as an asset in bankruptcy

cases simply because the mere existence of the condition of bankruptcy precludes

the existence of business [goodwill]." Appellee's Br. at 27 (quoting *Jones v.*

*Rowland*, 457 F.2d 44, 46 (10th Cir. 1972)). While this may be true for some

bankruptcy cases, the record here is clear that Windstream was operating as usual

while in bankruptcy proceedings, as evidenced by its ability to obtain $1 billion in

debtor-in-possession financing. Similarly, the fact that Windstream had such a

robust customer base to be targeted by Charter's advertising scheme is further

evidence that Windstream retained its goodwill throughout its bankruptcy. *See*

*Golden*, 122 B.R. at 20 ("Under certain circumstances where a debtor has

16

contractual arrangements with its customers which can be translated into assured sales or income, such intangible property rights or [goodwill] can be protected from interference by others within the context of 11 U.S.C. § 362(a)(3)."). We therefore conclude that Windstream's goodwill is properly classified as property of the estate.

**B.   Did Charter Exercise Control over Windstream's "estate property"?**

Having found that both Windstream's customer contracts and its goodwill are property of the estate, we now turn to whether Charter exercised control over those assets within the meaning of § 362(a)(3).

In the context of the automatic stay provision, the Supreme Court has interpreted "obtain possession of" as to "[t]ake something from" or "exercise[ ] dominion over." *Cf. Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 21 (1995). "[A] typical definition of 'control' is: 'To exercise authority over; direct; command.'" *In re Weber*, 719 F.3d 72, 79 (2d Cir. 2013), *abrogated on other grounds by City of Chicago v. Fulton*, 592 U.S. 154 (2021) (quoting WEBSTER'S NEW WORLD COLLEGE DICTIONARY (4th ed. 2002)).

Charter did not take possession or exercise control over Windstream's customer contracts or goodwill. Rather, it launched an advertising campaign to

17

convince Windstream customers to switch their subscriptions to Charter. Windstream's argument appears to blur the distinction between customers and customer contracts, but they are separate. *See Golden*, 122 B.R. at 21 ("[T]he defendants' solicitation of customers of the debtor whose names were readily obtainable from . . . public sources does not constitute an impermissible obtaining of possession or control by the defendants of property of the debtor's estate, or from the debtor's estate."). As the district court aptly noted, "the kinds of acts that can be said to 'impair' or 'interfere' with estate property such that they can plausibly amount to the 'exercise [of] control' . . . involve litigation or other legal action that would, or did, indirectly destroy or transfer control of the debtor's property." *Windstream II*, 634 F. Supp. 3d at 109. Conduct that affects consumer behavior is different from the type of conduct proscribed by § 362(a)(3) of the Bankruptcy Code.

The Bankruptcy Code does not prevent a third-party competitor from informing the public about a debtor's insolvency or even criticizing the debtor for its inability to sustain its business. *See, e.g., Matter of Nat'l Serv. Corp.*, 742 F.2d 859, 862 (5th Cir. 1984) (billboard publicizing fact that debtor business was in bankruptcy and that debtor failed to pay its bills "constitutes pure speech" and

18

not stayed by bankruptcy law).  Nor does the Bankruptcy Code prohibit mere advisement of rights.  *See In re U.S. Elec., Inc.*, 123 B.R. 262, 265 (Bankr. S.D. Ohio 1990) (supplier's post-petition contacts with debtor contractor's customers to inform them by letter that they could pay supplier directly and then deduct payments from amounts owing to debtor on construction project did not violate stay because supplier "merely informed those customers" of their possible setoff rights).

Although we have described the automatic stay as prohibiting actions that "interfere with" the administration of a bankruptcy estate, *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d at 207, the stay provision should not be construed so broadly as to impose sanctions on Charter for its conduct here.  The Supreme Court has repeatedly held that actions that interfere with the debtor's property do not necessarily violate the automatic stay.  *See Fulton*, 592 U.S. at 156 (no violation when creditor retained possession of debtor's property); *Strumpf*, 516 U.S. at 21 (no violation when creditor refused to pay debt subject to setoff).  In *Picard v. Fairfield Greenwich Ltd.*, the bankruptcy trustee sought to enjoin certain third-party agreements because they impaired his ability to recover assets that had been transferred by the debtor to one of those third parties.  *See* 762 F.3d at 204–05.  In

19

that case, we "decline[d] to . . . automatically stay actions taken against third parties that are only factually likely, as opposed to legally certain, to impact estate property," *id*. at 208, even though the *Picard v. Fairfield Greenwich Ltd.* parties' actions would likely "interfere with" the administration of the bankruptcy estate, *id.* at 207. Like the third-party agreements in *Picard v. Fairfield Greenwich Ltd.*, Charter's advertisements were only factually likely, as opposed to legally certain, to affect Windstream's customer contracts and goodwill.

Windstream's reliance on *Alert* is misplaced. Windstream argues that *Alert* "held that the same type of misconduct—passing oneself off as associated with a debtor and misrepresenting the effect of the debtor's bankruptcy to induce the debtor's customers to switch their services to a competitor—violates the automatic stay." Appellant's Br. at 42 (citing *Alert*, 148 B.R. at 203). *Alert*, however, is factually distinguishable from the case at hand. The defendants in *Alert* had access to the debtor's customer list which they used to contact the debtor's customers, inform them that the debtor was going out of business, and further mislead them into believing that the defendant had been authorized to take over their accounts. *Alert*, 148 B.R. at 197–98. The defendants then sent representatives to the customers' homes to switch their service. *Id*. at 198. Here, in contrast, there is no

20

evidence in the record to suggest that Charter possessed or used any of Windstream's proprietary information—such as its customer lists—nor was there evidence showing that Charter misrepresented that it was, in fact, taking over Windstream's accounts.

The automatic stay exists to give debtors a "fresh start," but not the "head start" that could result from allowing a debtor to prevent competition. *See In re Kokoszka*, 479 F.2d 990, 995 (2d Cir. 1973). Construing "exercise control" to include any action that affects consumer choice would prohibit any advertising (indeed, any competition) with a debtor during bankruptcy—an unimaginable result. To avoid that consequence, the bankruptcy court created a distinction between "improper" advertising (e.g., Charter's advertising in this case) and "legitimate" advertising before concluding that the automatic stay prohibits the former. *Windstream I*, 627 B.R. at 47. We are not convinced that this distinction is tenable as the Bankruptcy Code does not distinguish between "improper" and "legitimate" actions that violate the automatic stay. The bankruptcy court cited no authority for the dichotomy it drew.

Because we are skeptical that by its actions, Charter "exercised control" over Windstream's estate property under the Bankruptcy Code, we hold that there is,

at least, a "fair ground of doubt" that Charter violated the automatic stay.[8] Given the circumstances presented here, we cannot say that the district court erred.

## CONCLUSION

We have considered the parties' remaining arguments and find them to be without merit. For the reasons set forth above, we **AFFIRM** the judgment of the district court.

---

[8] This holding, made under the facts of this case, is not meant to imply that a competitor may never run afoul of the automatic stay through its advertising efforts against a competitor in bankruptcy. Indeed, we can imagine scenarios whereby a competitor's advertising conduct amounted to an exercise of control over the debtor's contracts and the estate property. *See, e.g.,* *Alert*, 148 B.R. at 198, 203.